1  Jeff Dominic Price   JDP PC  |  SBN 165534
   730 Arizona Avenue, Suite 200
2  Santa Monica, California 90401-1702
   jdp@jdpfirm.com
3  Tel. 310.451.2222

4  Attorney for the Plaintiff

5

6

7

8                    **UNITED STATES DISTRICT COURT**
                     **EASTERN DISTRICT OF CALIFORNIA**
9

10  ALAIN DEVEROUX, Individually, and as Co-        No.
    successor in Interest, and JENNIFER VALLE,
11  Individually, and as Co-successor in Interest of   COMPLAINT FOR DAMAGES AND
    JULIEN DEVEROUX, Deceased,                      DECLARATORY RELIEF
12
              Plaintiffs,                           1.  42 U.S.C. § 1983 – Deprivation of
13                                                      Constitutional Rights, Excessive Force;
              vs.                                   2.  42 U.S.C. § 1983 – Deprivation of
14                                                      Constitutional Rights, Failure to provide
    KERN COUNTY SHERIFF DONNY                           treatment for serious medical needs;
15  YOUNGBLOOD, COUNTY OF KERN,                     3.  42 U.S.C. § 1983 – Deprivation of
    KERN COUNTY HOSPITAL AUTHORITY,                     Constitutional Rights, Freedom of
16  JOHN DOE, JANE ROE, RICHARD ROE,                    Association and Substantive Due
    KERN COUNTY SHERIFF'S DETENTION                     Process;
17  DEPUTY AUSTIN MCROBERTS, NURSE                  4.  42 U.S.C. § 1983 – Municipal and
    DOE, Does 1-20 inclusive, Jointly and              Supervisory Liability;
18  Severally,                                      5.  California Civil Code § 52.1(b) – Civil
                                                       Rights Violations;
19            Defendants.                           6.  California Government Code § 845.6 –
                                                       Failure to Summon Medical Care;
20                                                  7.  Negligence and Wrongful Death

21

22

23                                                  Demand for Jury Trial

24        PLAINTIFFS aver:

25                              **Jurisdiction**

26        1.      On or about January 14, 2022, Julien Deveroux, the son of the plaintiffs, died

27  inside a Kern County jail cell; he was 27 years of age and a pretrial detainee in the custody of the

28

defendants, the County of Kern ("KCO") and its officials and employees; this is a wrongful death and survival action arising from the Defendants' use of excessive force against Julien Deveroux and concurrent failure to provide for Julien Deveroux's serious medical needs, failure to provide prompt treatment, negligence, failure to promptly summon medical aid, and failure to perform other legal obligations concerning Decedent's serious medical needs and constitutional rights. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because it is being brought to obtain compensatory and punitive damages for the deprivation, under color of state law, of the rights of citizens of the United States that are secured by the United States Constitution, pursuant to 42 U.S.C. §§ 1983 and 1988. This action is brought pursuant to the First, Fourth, and Fourteenth Amendments to the United States Constitution, and the laws and Constitution of the State of California. Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367 (a), to hear and decide claims arising under state law.

2.    Venue is proper in the United States District Court for the Eastern District of California, pursuant to 28 U.S.C. § 1391(b)(1)-(2), because the named defendants, and other, to-be-identified (currently named as Does) defendants reside in this judicial district, and a substantial part of the events or omissions giving rise to the claims occurred in the County of Kern ("County") in this judicial district.

**Parties and Procedure**

3.    Plaintiff ALAIN DEVEROUX is a citizen of the United States, a competent adult, and is a surviving parent of JULIEN DEVEROUX ("Decedent," or "decedent"), deceased, who had no issue. Plaintiff Alain Deveroux is a proper co-successor in interest to decedent, pursuant to California Code of Civil Procedure § 377.11. Plaintiff Alain Deveroux brings these claims individually and, with respect to the survival claims, as successor-in-interest for Julien Deveroux, deceased, and the claims are brought pursuant to California Code of Civil Procedure sections 377.20, et seq. and 377.60, et seq., which provide for survival and wrongful death actions. The claims set forth below are also brought by Alain Deveroux individually and on behalf of Decedent, as co-successor-in-interest, on the basis of 42 U.S.C. §§ 1983 and 1988, the United States

Constitution, and federal and state civil rights law. A successor-in-interest declaration, demonstrating that Alain Deveroux is the surviving parent and proper successor-in-interest of decedent, that there is no proceeding pending in California for the administration of the decedent's estate, that Alain Deveroux is the decedent's next of kin and successor-in-interest, as defined in Section 377.11 of the California Code of Civil Procedure and, thus, that Alain Deveroux succeeds to the interests of Julien Deveroux, as well as all other requisite elements of such a declaration, will be filed.

4.    Plaintiff JENNIFER VALLE is a citizen of the United States, a competent adult, and is a surviving parent of Julien Deveroux, deceased, who had no issue. Plaintiff Jennifer Valle is a proper co-successor in interest to decedent, pursuant to California Code of Civil Procedure § 377.11. Plaintiff Jennifer Valle brings these claims individually and, with respect to the survival claims, as successor-in-interest for Julien Deveroux, deceased, and the claims are brought pursuant to California Code of Civil Procedure sections 377.20, et seq. and 377.60, et seq., which provide for survival and wrongful death actions. The claims set forth below are also brought by Jennifer Valle individually and on behalf of Decedent, as co-successor-in-interest, on the basis of 42 U.S.C. §§ 1983 and 1988, the United States Constitution, and federal and state civil rights law. A successor-in-interest declaration, demonstrating that Jennifer Valle is the surviving parent and proper successor-in-interest of decedent, that there is no proceeding pending in California for the administration of the decedent's estate, that Jennifer Valle is the decedent's next of kin and successor-in-interest, as defined in Section 377.11 of the California Code of Civil Procedure and, thus, that Jennifer Valle succeeds to the interests of Julien Deveroux, as well as all other requisite elements of such a declaration, will be filed.

5.    Defendant COUNTY OF KERN is a municipal corporation, duly organized and existing under the laws of the State of California, and is the employer of the individual County defendants, as well as certain, to-be-identified Doe Defendants. Under its authority, the County operates the Kern County Sheriff's Office ("KCSO").

6.      Defendant KERN COUNTY HOSPITAL AUTHORITY ("KCHA") is a separate public entity and or agency that is operated under the auspices of the County and is liable under principles of respondeat superior for the acts and conduct of its employees acting within the scope of their employment in the context of the common law causes of action.

7.      At all times material, Defendant KCO was a public entity operating the Lerdo Pre-Trial Facility, where the decedent was incarcerated prior to, during, and at the time of, the acts, omissions, and other events that gave rise to this litigation, and was responsible for supervising, enacting, and enforcing the KCSO conduct, policies, and practices, as well as the hiring, retaining, and training of employees and agents of the County, KCHA, and KCSO, including Defendants DONNY YOUNGBLOOD, AUSTIN McROBERTS, certain Doe Defendants, and all of County's, and or KCHA's, and or KCSO's members, agents, and employees. Donny Youngblood, Austin McRoberts, and Doe Defendants are sued in their Individual Capacities. At all material times, these individual Defendants held titles and participated generally as follows in this matter:

a.   Defendant, Sheriff-Coroner Donny Youngblood ("Youngblood" or "Sheriff" or "the Sheriff"), at all relevant times mentioned herein was employed by Defendant KCO as Sheriff-Coroner, and was acting within the course and scope of that employment at such times. He is being sued in his individual capacity as KCO Sheriff. At all material times, the Sheriff was a final policy making official of KCO for the KCO Sheriff's Office and Custody division, including all jails, ultimately responsible for all policies, procedures, supervision, and training for the KCSO and jails, including the Lerdo Pre-Trial Facility ("Lerdo"). Defendant Youngblood was also "required by statute to take charge of and keep the county jail and prisoners in it, and is answerable for the prisoner's safekeeping." *Starr v. Baca,* 652 F.3d 1202, 1208 (9th Cir. 2011) (quoting *Redman v. Cnty. of San Diego,* 942 F.2d 1435, 1446 (9th Cir. 1991) (*en banc*).

b.   At all times mentioned herein, the to-be-identified Doe Defendants, JANE ROE, a Lieutenant ("Roe 1") and RICHARD ROE, a County Jail Commander ("Roe 2"), were employed by KCSO as a Lieutenant in command of Lerdo and the Commander (with

an appropriate rank) in charge of the KCO jails. At all material times, these Defendants were policy making officials for Lerdo and the KCO jails, with authority delegated to them by the Sheriff or the County, and were responsible for all policies, procedures, supervision, and training at Lerdo and the jails.

c.   Defendant JOHN DOE ("Doe 1"), at all material times, was a Kern County Sheriff's Sergeant, who was employed by KCO and KCSO; s/he was acting within the course and scope of that employment at such times, including being on duty at Lerdo at the time Decedent suffered his injuries, and was the Sergeant assigned to the pod in the jail in which the Decedent was housed at all relevant times, responsible for the safety and security of inmates in that facility, which included the cell(s) in which the Decedent suffered his injuries. Defendant Doe 1 was responsible for, inter alia, supervising the Detention Deputies and other KCO staff, including, but not limited to, Austin McRoberts, and any other, to-be-identified Doe Defendants, to ensure they properly performed their duties, including properly housing and classifying pretrial detainees, properly supervising inmates, conducting proper cell checks and other safety checks, supervising inmates, promptly summoning medical care when necessary, and performing other tasks to ensure inmate safety, ensuring the proper housing of KCO inmates, ensuring that proper, timely, and complete cell checks were conducted, ensuring the safety of KCO inmates in the facility he was in charge of, ensuring that the periodic supervision of inmates occurred, and was responsible in general for the supervision of personnel below him in the chain of command, who had a legal duty to appropriately house, classify, supervise, protect, and summon medical care for inmates under their care, including Decedent.

d.   Defendants Austin McRoberts, and other, to-be-identified Doe Defendants were, at all material times, KCSO Detention Deputies, who were employed by KCO, and were acting within the course and scope of that employment at all relevant times. These Detention Deputies were on duty at the relevant times in the pod that contained the

cell(s) in which the Decedent was housed, in which he suffered his unnecessary and grievous injuries. Defendants McRoberts et al. were on duty in the pod prior to, leading up to, and during the time in which Decedent was injured and suffered life-threatening injuries, as set forth more fully, *infra*, and were responsible for, during that time, ensuring proper classification and or safe housing of inmates, supervising the inmates in the area in which Decedent was housed, conducting periodic and appropriate cell checks, ensuring that inmates were housed appropriately and were not in danger of serious injury, ensuring inmates did not pose a threat to their own safety, were responsible for promptly summoning appropriate medical care, and were, in other relevant respects, responsible for ensuring the protection and safety of pretrial detainees, including Decedent. Defendant McRoberts was on duty at 0200 hours, when he saw Decedent lying on the floor, and, instead of promptly summoning emergency medical care (i.e., an ambulance), left Decedent lying on the floor until 0509 hours when Decedent was seen in the same position and nonresponsive. These defendants breached their duties owed to Decedent and Plaintiffs, which proximately led to the death of J. Deveroux.

e. Defendant Nurse Doe was a nurse employed by Defendant KCHA and responsible for monitoring Julien Deveroux, who was known to be a pretrial detainee who was suicidal, had recently been declared by a court of general jurisdiction to be incompetent to stand trial under the California Penal Code, was prescribed Adderall and Xanax, and was a danger to himself and unable to protect himself.

8. Certain Doe Defendants, at all material times, were employees and agents of Defendant KCO, responsible for appropriate and safe housing, housing classification, monitoring, supervision, safety, and protection of detainees, in the KCO's jail, with appropriate observation, as well as being responsible for promptly summoning medical care for seriously injured detainees. In doing the acts or omissions hereinafter described, certain Doe Defendants acted within the course and scope of their employment with KCO and acted under color of state law. The individually

named Defendants and certain Doe Defendants were either Kern County Sheriff's Detention Deputies, Correctional Officers, Sheriff's Deputies, Sergeants, Captains, Lieutenants, or other Peace Officers, Doctors, Nurses, Social Workers, and or civilian employees and or agents, who were responsible for the care, housing, observation, and safety of detainees, including Decedent, and or were responsible for caring for jail inmates, including Decedent, including promptly summoning medical care and or the transfer of Decedent for inpatient acute care to Kern Medical Center or another emergency trauma center.

9.      The Defendants named above and certain Doe Defendants are sued in their individual capacities.

10.      The true names or capacities, whether individual, corporate, associate, or otherwise, of Defendants named herein as Does 1 through 20 are unknown to Plaintiffs because KCO violated the California Public Records Act and during the period of time after the denial of the tort claim on August 16, 2022, refused to provide documents responsive to several CPRA requests, so Plaintiffs therefore sue said Defendants by said fictitious names. Plaintiffs will amend this Complaint to show said defendants' true names and capacities when the same have been ascertained. Plaintiffs are informed, believe, and thereon allege that all Defendants sued herein as Does are in some manner responsible for the acts, omissions, and injuries alleged herein.

11.      Plaintiffs allege that each of the Defendants sued herein was wrongfully, deliberately indifferently, negligently, and or otherwise responsible in some manner for the events and happenings as hereinafter described, and proximately caused injuries and damages to Plaintiff and or Decedent. Further, one or more Doe Defendants was at all material times responsible for the hiring, training, supervision, and discipline of other defendants, including both the individually named and Doe Defendants.

12.      Plaintiffs are informed, believe, and thereon allege that each of the defendants was at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, and or alter ego of the remaining Defendants, and in doing the things hereinafter alleged, was acting within the course and scope of that relationship. Plaintiffs are further informed, believe, and

thereon allege that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and or authorized the acts or omissions of each Defendant as alleged herein, except as may hereinafter be otherwise, specifically alleged. At all material times, each Defendant was an integral participant, jointly and fundamentally engaged in constitutionally violative, unlawful, and or tortious activity, resulting in the deprivation of Plaintiff's and Decedent's constitutional rights and other actionable harm.

13.    The acts and omissions of all Defendants were at all material times pursuant to the actual customs, policies, practices, and or procedures of KCO and or the Kern County Hospital Authority ("KCHA").

14.    At all material times, each Defendant acted under color of the laws, statutes, ordinances, and regulations of the State of California.

15.    A proper and timely tort claim was presented to the County of Kern (which includes the Kern County Hospital Authority) on behalf of Plaintiffs and Decedent, pursuant to Government Code § 910 et seq., and this action was thereafter timely filed within all applicable statutes of limitation.

16.    This complaint may be pled in the alternative, pursuant to Rule 8(d)(2) of the Federal Rules of Civil Procedure.

17.    Under Rule 9(b) conditions of a person's mind, such as, but not limited to, malice, intent, and knowledge may be alleged generally.

**Averments**

18.    On August 12, 2020, while incarcerated in the custody of the County of Kern and KCSO, Julien Deveroux was found incompetent to stand trial or to cooperate with counsel by the Superior Court, State of California, County of Kern.

19.    On September 8, 2020, while incarcerated in the custody of the County of Kern and the KCSO, Julien Deveroux was ordered by the Superior Court committed to the Department of Mental Health at any appropriate state hospital for a maximum commitment of 2 years.

20.     On May 6, 2021, the Superior Court found that Julien Deveroux, who was incarcerated in the custody of the County of Kern, was restored to competency.

21.     On May 10, 2021, the Superior Court found Julien Deveroux guilty upon a plea of guilty and sentenced him to two years felony probation with credit for time served.

22.     On May 17, 2021, Julien was out of custody; on May 25, after countless sleepless nights and severe depression, Alain Deveroux took Julien to the Mary K. Shell Mental Health Center in Bakersfield for help.

23.     On June 5 of the same year, they visited Frazier Park Behavioral Health Center for help.

24.     On June 25, 2021, Julien was evaluated in Culver City by psychiatrists and later admitted as a study patient for one week.

25.     On June 30 of the same year, Alain Deveroux spoke to Julien's Public Defender regarding his mental status.

26.     In July 2021, Julien visited the Mary K. Shell Mental Health Center but was turned away by the medical staff.

27.     On July 20, 2021, Julien Deveroux was found in violation of probation and was sentenced to formal probation for a period of three years, with credit for 319 days actual time served in jail.

28.     In the month of August 2021, Julien underwent one month of therapy at Henry Mayo Newhall Hospital, in Valencia, California.

29.     In October of the same year Julien underwent a mental health evaluation, on two occasions, at the Mary K. Shell Mental Health Center, in order to be admitted for mental health treatment.

30.     On December 27, 2021, Julien was admitted at Henry Mayo Newhall Hospital for possible poisoning treatment and a mental health evaluation.

31.     The following day Alain Deveroux called the Frazier Park Behavioral Health Center to schedule an appointment with a psychiatrist.

32.    On December 28, 2021, Julien attempted suicide by leaving the house at night, at approximately 2045 hours, in the middle of a snow storm wearing shorts and a t-shirt and flip flops; he had read on the internet that dying by freezing is a relatively painless way to die. Alain Deveroux attempted to track Julien but could not and called KCSO by 911 at about 2100 hours and informed them that his son had left the house in an attempt to commit suicide by freezing to death, and he called at approximately 2200 hours and on at least one other occasions. A KCSO deputy arrived around 0200 hours on December 29, 2021, about an hour after Julien had returned to the house. His shirt was wet because he had been lying in snow.

33.    On December 30, 2021, Julien was arrested by KCSO and taken to the Kern County Sheriff Central Receiving Facility in Bakersfield, California; 15 days later he was dead.

34.    The arresting deputy was notified of Julien's mental health condition, that he was prescribed Adderall and Xanax, and that Julien was suicidal and that he had attempted suicide two days earlier; in addition, Alain Deveroux called KCSO at the holding facility in Bakersfield and informed KCSO personnel of Julien's mental health history and that he was suicidal and had attempted suicide two days earlier.

35.    On January 2, 2022, Alain Deveroux called KCSO and notified personnel at Lerdo about Julien's mental health status, that he was prescribed Adderall and Xanax, and that he was suicidal and had attempted suicide 4 days earlier.

36.    Alain Deveroux also talked to a Deputy District Attorney in Bakersfield, who was aware of Julien's mental health status and prior arrest.

37.    In addition, Alain Deveroux spoke to Julien's Probation Officer on numerous occasions and asked for help.

38.    During this time, Alain Deveroux had made over 20 calls to the Mental Health Advocate and the Mental Health Help Line.

39.    After his arrest Julien Deveroux never walked free again because of the defendants' use of excessive force against him, deliberate indifference to his serious medical needs and failure to protect him, culminating in his death while lying on a floor in Lerdo cell 216 on January 14,

2022. The cause of death was excessive force by taser and blunt force, posterior occipital scalp hemorrhage, cardiorespiratory arrest, hypertensive cardiovascular disease, myocardial hypertrophy and pulmonary edema.

      40.    KCSO Receiving staff, as well as KCO and KCHA medical staff, were informed or aware of and or knew or had reason to know at the time of booking that Julien Deveroux had a significant medical and mental health history, had a history of mental illness and treatment, had medical and mental health problems involving prescription medication and alcohol, and required and or was taking certain medications. Even prior to the time the Decedent was booked into Lerdo, KCO/KCSO/KCHA had both actual and constructive knowledge that Julien Deveroux had serious mental illness; KCSO Deputies had responded on several previous occasions to the same residence at which the Decedent was arrested (prior to the incident that precipitated the decedent's arrest) regarding his mental illness. The decedent had been to the Mary K. Shell Mental Health Center, in Bakersfield, for treatment. At the time of his arrest, on or about December 30, 2022, the Decedent was suffering from serious mental illness and suicidal ideation. The County and, by extension, Defendants also knew and or had constructive knowledge of the fact that the Decedent had previously been medically treated at Kern Medical Center and elsewhere for mental illness and that the decedent was schizophrenic and had Tourette Syndrome. The intake and medical staff also knew that Julien Deveroux had a history of suicide attempts in the past, so they considered placing him on suicide watch.

      41.    The Defendants knew, had constructive knowledge of, or had reason to know that the Decedent was prescribed Xanax and Adderall.

      42.    Thereafter, in the Lerdo jail or at the receiving facility in Bakersfield, the Decedent was improperly medically screened by a nurse or other personnel, a Doe defendant, resulting in his not being placed on suicide watch or transferred to a hospital and cleared him for incarceration in jail.

      43.    Lerdo consists of 6 pods completed in 1987 and a seventh pod completed in 1989; each pod has six housing units on two floors with a capacity of 32 inmates per unit, and the first

floor cells open directly onto a main room and the second floor cells open onto a balcony that overlooks the main room.

44.    The Lerdo facility is designed for keyless operation and the pod officer is separated from the prisoners by electric doors and shatter proof glass.

45.    Sometime after his arrival at Lerdo, which was on or about January 1, 2022, Julien Deveroux was transferred to C-pod, Cell 216.

46.    On January 4, 2022, a felony arraignment hearing was set for Julien Deveroux; Julien Deveroux's mental illness resulted in his refusing to be transported to court and the Court consequently authorized KCSO to use "reasonable force" to transport Julien to court and continued the arraignment to January 6, 2022.

47.    On January 6, 2022, Julien Deveroux again refused to be transported to court and the Court appointed Dr. Gary Longwith to examine and evaluate Julien pursuant to Penal Code § 1368, and continued the matter to January 7, 2022, and once again authorized KCSO to use "reasonable force" to transport Julien to court.

48.    On January 7, 2022, Julien Deveroux again refused to be transported to court and the Court once again authorized KCSO to use "reasonable force" to transport Julien to court and continued the hearing to January 11, 2022.

49.    Gary Longwith, M.D., was, at all material times, a Clinical Psychologist, who was employed by the County of Kern to conduct a competency evaluation of Julien Deveroux by order of the Superior Court.

50.    On or about January 10, 2022, Dr. Longwith went to Lerdo to evaluate Julien Deveroux and informed KCSO custody personnel at Lerdo that he was present to conduct a medical evaluation of Julien Deveroux but Lerdo custody personnel informed him that Julien Deveroux refused to exit the cell.

51.    On January 11, 2022, KCSO deputies transported Julien Deveroux to court for the arraignment; at the arraignment a plea of not guilty was entered on Julien Deveroux's behalf by his attorney and his attorney requested a competency evaluation pursuant to Section 1368.

52.     The KCSO staff at Lerdo were aware of Julien's mental health history, including a history of prior suicidal ideation and suicide attempts, this information was contained in his inmate file, and Mr. Deveroux repeatedly called the facility between December 30, 2021, and January 14, 2022, to alert the staff to Julien's mental health issues and his inability to protect himself. Despite this information, prison officers refused to place Julien into medical treatment, and instead repeatedly subjected him to isolation and physical punishment, ultimately resulting in his death.

53.     KCSO staff at Lerdo and Defendant McRoberts, Nurse Doe, and other Doe defendants were aware that Julien was subjected to the unlawful use of force by KCSO deputies on at least one occasion, and possibly multiple occasions, beginning on December 30, 2021, during which time the deputies used unlawful and excessive force against Julien, including blows to the head and body and use of a Taser.

54.     On or about January 14, 2022, Defendant McRoberts, in league with other Detention deputies and officers, Doe defendants, used excessive and unreasonable physical force against Julien Deveroux and shot Julien Deveroux with a Taser device.

55.     On or about January 14, 2022, Defendant McRoberts was either a direct participant in the use of excessive force, including the use of the Taser on Julien Deveroux in the sense that he deployed the Taser and used excessive force against Julien Deveroux or he is liable as an intervenor because he had the opportunity to stop the use of the Taser against Julien Deveroux and the use of excessive force against Julien Deveroux but failed to intervene to stop the use of the Taser and the use of excessive force on Julien Deveroux.

56.     As a result, Julien Deveroux suffered from damage to his heart, heart stoppage and irregular heartbeat, which proximately caused his death.

57.     As a result, Julien Deveroux suffered from damage to his heart, heart stoppage and irregular heartbeat, which proximately caused his death, although he could have been saved had he been provided with adequate medical care.

58.    In the ensuing minutes and hours after the use of force by Defendant McRoberts and others, Defendant McRoberts and other Doe defendants observed Julien Deveroux lying on the concrete floor inside Cell 216 and observed that he was nonresponsive.

59.    The last time Defendant McRoberts and other Doe defendants observed Julien Deveroux "normal" was at 0200 hours on January 14, 2022, at the latest.

60.    In the ensuing minutes and hours after the use of force by the defendants, Defendant McRoberts and other Doe defendants left Julien Deveroux unattended for more than 3 hours and 25 minutes, while Julien Deveroux lay dying on the concrete in Cell 216, through and including the time when he actually died on their watch.

61.    Defendant McRoberts and the Doe defendants knew or should have known that when Decedent was observed lying on the concrete floor from 0200 hours through 0527 hours he was suffering from a serious acute medical condition, but the defendants appreciated the risk and intentionally failed to act by standing by idly rather than responding with reasonable diligence to treat the condition.

62.    As a result of the intentional acts and omissions of Defendant McRoberts and the Doe defendants in standing idly by and failing to provide medical treatment with reasonable diligence, Julien Deveroux died.

63.    At the present time, because of the acts of the defendants, it is unknown whether Julien Deveroux died as a result of the use of excessive force against him by the defendants, or whether he died as a result of a combination and concurrence of the use of excessive force against him and their callous failure and denial of medical care and deliberate indifference to his serious medical needs subsequent to or before the use of excessive force against him, or whether he died of suicide as a result of the deliberate indifference of the defendants to his serious medical needs, or whether he died as a result of suicide in combination with the defendants' deliberate indifference to his serious medical needs and their use of excessive force against him, but his death is a result of the tortious and intentional and or deliberately indifferent and negligent or intentional and deliberately indifferent actions of the defendants.

64.     KCO and KCHA employees failed to protect the Decedent from suffering grievous injuries, suffering, pain, and death.

65.     KCO jail and KCO and KCHA medical personnel, including, but not limited to, the Defendants named herein, failed to properly and appropriately assess and classify the Decedent based on his serious medical needs. Further, Defendants failed to properly house and monitor the Decedent by, among other things, placing him on suicide watch, failing to conduct appropriate checks, failing to properly summon emergency medical care after he was observed lying nonresponsive on the floor, failing to properly treat him, failing to properly monitor his medications or their side-effects, failing to properly house him in view of his medications and their side-effects, failing to properly house him in view of his mental health issues, being suicidal and incompetent, failing to properly house him in view of the fact he posed a threat to his own safety, failing to properly house Julien Deveroux when they knew that the Superior Court had declared a doubt as to his competency to stand trial and that he had yet to be evaluated, and failing to properly, immediately, and promptly summon medical care.

66.     Additionally, and in the alternative, while incarcerated by KCO – and under the treatment of employees of the KCO and KCHA – during all material times, the named Defendants and currently unidentified Detention Deputies, Sergeants, Lieutenants, jail administrators, medical personnel, and or other law enforcement officers and or other KCO and KCHA employees knew and or had reason to know that Julien Deveroux was a mentally ill and emotionally disturbed person who was suicidal and who had been deemed incompetent to stand trial by the Superior Court in the County of Kern, with immediate and serious medical needs. Defendants further knew and or had reason to know that the Decedent was undergoing a mental health crisis and or was a danger to himself and or was at risk of seriously injuring himself and or being unable to care for his own safety. Defendants also knew, had reason to know, or should have known that the Decedent needed to be treated, monitored, and properly observed or serious harm to the physical or mental health of ho, would result. Defendants failed to do the foregoing and, consequently,

were negligent and or deliberately indifferent to Julien Deveroux's immediate and serious medical needs, which caused the injury to and the death of Julien Deveroux.

67.     The individually named Defendants, other Jail and medical personnel, and Does 1-20 failed to properly and appropriately assess the medical and court records of Julien Deveroux and failed to properly classify Julien Deveroux within the jail.

68.     The Defendants' actions and omissions and the manner in which Julien Deveroux was incarcerated was contrary to generally accepted practices and jail procedures, causing the wrongful death of Julien Deveroux.

69.     At all material times and, alternatively, the actions and omissions of each Defendant were intentional, and or wanton and or willful, and or conscience shocking, and or reckless, and or callous, and or malicious, and or deliberately indifferent to Plaintiffs' and Decedent's rights, and or grossly negligent, and or negligent.

70.     As a direct and proximate result of each Defendant's acts and or omissions as set forth above, Plaintiffs, Individually, sustained the following injuries and damages, past and future, including, but not limited to:

   a.   The wrongful death of Julien Deveroux;

   b.   Loss of support and familial relationships, including loss of love, companionship, comfort, consortium, affection, society, services, solace, and moral support;

   c.   Emotional distress from the violations of his personal Constitutional rights, including grief, sorrow, anxiety, sleeplessness, humiliation, and indignity;

   d.   Loss of enjoyment of life;

   e.   All other legally cognizable special and general damages;

   f.   Violations of state and federal constitutional rights; and,

   g.   All damages and penalties recoverable under 42 U.S.C. §§ 1983 and 1988, California Civil Code §§ 52 and 52.1, and as otherwise allowed under California and United States statutes, codes, and common law.

71.    As a direct and proximate result of each Defendant's acts and or omissions as set forth above, Plaintiffs, as Successor in Interest of Decedent, sustained the following injuries and damages, past and future, including, but not limited to:

    a.  Hospital and medical expenses incurred by Julien Deveroux;

    b.  Coroner's fees, funeral, and burial expenses;

    c.  Julien Deveroux's loss of life and loss of enjoyment of life, pursuant to federal civil rights law;

    d.  Julien Deveroux's conscious pain and suffering, pursuant to federal civil rights law; and,

    e.  All damages and penalties recoverable under 42 U.S.C. §§ 1983 and 1988, California Civil Code § 52, and as otherwise allowed under California and United States statutes, codes, and common law.

72.    The (1) deliberate indifference to the serious medical needs of Julien Deveroux and the (2) objectively unreasonable and (3) deliberately indifferent failure to provide Julien Deveroux with adequate medical care, and (4) the use of excessive force against Julien Deveroux, each of which, independently, was the substantial and proximate cause of his death was caused by the defendant local governing bodies, KCO and KCHA.

73.    The individual defendants, who, at all relevant times acted under color of state law, acted pursuant to an expressly adopted official policy or a widespread or longstanding practice or customs of KCO and KCHA or of KCO or KCHA.

74.    The individual defendants acted pursuant to an expressly adopted official policy resulting from a deliberate choice to follow a course of action made from among various alternatives by defendant Youngblood and other KCO final policymakers that subordinates the safety and health of jail inmates, including pretrial detainees, to the budgetary concerns of KCO by requiring that injured or ill pretrial detainees not be transferred to the hospital unless ordered by a physician while also not requiring that suicidal and incompetent pretrial detainees, be examined by a physician.

75. The individual defendants acted pursuant to a widespread or longstanding practice or custom constituting the standard operating procedure inside KCO jails that subordinates the safety and health of jail inmates, including pretrial detainees, to the budgetary concerns of KCO by requiring that injured, suicidal or incompetent pretrial detainees not be transferred to the hospital unless ordered by a physician while also not requiring that such pretrial detainees be examined by a physician.

76. Defendant Youngblood held final policymaking authority from KCO in the operation and management of the KCO jails and facilities, including the facilities where KCO incarcerated Julien Deveroux in December 2021 and January 2022, and concerning the acts and conduct of the individual defendants in this case, including the subordinate and corporate defendants.

77. Defendant Youngblood knew of and specifically made a deliberate choice to approve of the acts and conduct of the defendants and the bases for their acts and conduct.

78. All supervisorial liability defendants, including Youngblood, set in motion a series of events that led to the unlawful deliberate indifference to the serious medical needs of Julien Deveroux, a pretrial detainee in the care of defendant KCO, and, specifically, defendant Youngblood, a final policymaker and the Sheriff, and the supervisor of the individual defendants, specifically ratified the actual conduct of the individual defendants that is the subject of this action by (1) knowing of and specifically approving of the decisions made and the actions taken by the subordinate defendants, (2) specifically approving of the bases for those decisions made by those defendants, and (3) so ratifying and approving of the decisions and bases for the decisions of the defendants by means of the product of a conscious, affirmative choice to ratify the decisions and conduct of the defendants, resulting in the death of Julien Deveroux without due process of law, in a callous, fraudulent, oppressive manner and with reckless disregard.

79. Defendants KCO, KCHA, and Youngblood had ample reason to know, based upon complaints, reports, their observations, and court proceedings that KCO officials and or employees regularly engaged in the misdeeds set forth throughout this complaint.

80.    The training policies of KCO and KCHA were not adequate to train KCO, KCSO and KCHA employees to handle the usual and recurring situations with which they were faced involving pretrial detainees incarcerated in the KCO jails from 2014-January 2022.

81.    KCO and KCHA were deliberately indifferent to the known or obvious consequences of their failure to train jail and KCHA employees adequately.

82.    The failure of KCO and KCHA to provide adequate training caused the deprivations of the rights of Julien Deveroux and of the Plaintiffs by defendants, i.e., the failure of KCO and KCHA to provide adequate training was so closely related to the deprivation of the rights of the decedent and the plaintiff as to be the moving force that caused the ultimate injury – the pain and suffering inflicted upon Julien Deveroux leading up to his death.

83.    Defendants KCO, KCHA, and Youngblood, each of them or any combination of them were on actual or constructive notice that the KCO training program/regimen contained deficiencies that caused KCO employees and officials to conduct themselves in a manner that deprived pretrial detainees of their constitutional rights under the Fourth and Fourteenth amendments to be free from the deliberate indifference to their serious medical needs and to be free from being deprived of adequate medical care without due process of law under the circumstances presented in this case, yet these defendants chose in the face of this knowledge to retain the deficient training program.

84.    Thus, the defendants' policy of inaction to the deficiencies of the KCO training program constituted a decision on the part of KCO, the KCHA and Youngblood to violate the constitution.

85.    The KCO and KCSO and KCHA training program was deficient in its failure to train KCO and KCHA officers and employees (1) how to properly house suicidal inmates, (2) how to treat pretrial detainees who are suicidal, (3) how to identify pretrial detainees who are suicidal, who must be immediately examined by a physician, (4) how to identify pretrial detainees who are suicidal, who must be immediately removed to a hospital for treatment, (5) how to interact with pretrial detainees who have Tourette Syndrome, (6) how to identify Tourette Syndrome, which

Julien Deveroux was afflicted with, (7) the steps to take to determine if a pretrial detainee who should have been placed on suicide watch should be immediately placed on suicide watch, (8) how deputies are to treat pretrial detainees who are mentally ill and who engage in behavior that provokes the unreasonable use of force by deputies and how deputies are to diffuse situations caused by such inmates instead of escalating situations to the point where they use force against such inmates, who are unable to control their behavior as a result of their illnesses, including their mental illness, (9) of the existence of the NCCHC standards and how to understand and employ the NCCHC standards, and, *inter alia*, (10) how to monitor pretrial detainees who have been suicidal or are suicidal to determine whether they should be placed on suicide watch.

86.     Plaintiff alleges that these failures are the result of deliberate indifference on the part of defendants KCO, KCHA, and, *inter alia*, Youngblood by and through their decision makers and subordinates.

87.     Defendants KCO's and KCHA's failures to train, as described herein, were within the control of Defendants KCO and KCHA and within the feasibility of Defendants KCO and KCHA to alter, adjust and or correct so as to prevent some or all of the unlawful acts and injury complained of herein by Plaintiff.

88.     NCCHC Jail Standard J-A-01 states that it is "essential" that "[i]nmates have access to care for their serious medical, dental, and mental health needs." The standard provides that "[a]ccess to care means that, in a timely manner, a patient is seen by a qualified health care professional, is rendered a clinical judgment, and receives care that is ordered." The standard notes that "[i]nmates must have access to care to meet their serious health needs. This is the fundamental principle on while all National Commission on Correctional Health Care standards are based and is the basic principle established by the U.S. Supreme Court in the 1976 landmark case *Estelle v. Gamble*." The standard gives several examples of "[u]nreasonable barriers to inmates' access to health services," including "[h]aving an understaffed, underfunded, or poorly organized system with the result that it is not able to provide appropriate and timely access to care."

89.     NCCHC Jail Standard J-B-05 states that it is "essential" that "[s]uicides are

1  prevented when possible by implementing prevention efforts and intervention." The standard

2  provides that '[t]he responsible health authority and facility administrator approve the facility's

3  suicide prevention program."

4       90.    NCCHC Jail Standard J-E-02 states that it is "essential" that "[s]creening is

5  performed on all inmates upon arrival at the intake facility to ensure that emergent and urgent

6  health needs are met." The standard provides that "[r]eception personnel ensure that persons who

7  are * * * mentally unstable * * * are referred immediately for care and *medical clearance* into the

8  facility." The term "medical clearance" is defined as "a documented clinical assessment of

9  medical, dental, and mental status before an individual is admitted into the facility. The medical

10  clearance may come from on-site health staff or may require sending the individual to the hospital

11  emergency room." The standard notes that '[i]nmates with mental disorders are often unable to

12  give complete or accurate information in response to health status inquiries. Therefore, it is good

13  practice for mental health staff to be involved in training staff who do the intake screening."

14       91.  NCCHC Jail Standard J-E-04 states that it is "essential" that "[i]nmates receive initial

15  *health assessments*." The standard provides that the initial health assessment should take place

16  within 14 days of admission into the jail and should be done by a qualified health care

17  professional. The standard explains that "[t]he health assessment is the process whereby an

18  individual's health status is evaluated, including questioning the patient about symptoms. The

19  extent of the health assessment is defined by the responsible physician but should include at least

20  the steps noted in this standard."

21       92.    NCCHC Jail Standard J-E-05 states that it is "essential" that "[m]ental health

22  screening is performed to ensure that urgent mental health needs are met." The standard provides

23  that the mental health assessment should take place "as soon as possible but no later than 14

24  calendar days after admission" into the jail and should be done by a qualified mental health

25  professional or a qualified health care professional who has received documented training. The

26  standard notes that "[i]nmates who screen positive for mental health problems are referred to

27  qualified mental health professionals for further evaluation" within 20 days "or sooner if clinically

28

indicated. The standard explains that '[q]ualified mental health professionals include psychiatrists, psychologists, psychiatric social workers, psychiatric nurses, and others who by their education, credentials, and experience are permitted by law to evaluate and care for the mental health needs of patients.

93. NCCHC Jail Standard J-F-01 states that it is "essential" that "[p]atients with chronic disease, other significant health conditions, and disabilities receive ongoing multidisciplinary care aligned with evidence-based standards." The standard provides that mood disorders and psychotic disorders are examples of the types of health conditions that fall under this standard.

94. NCCHC Jail Standard J-F-03 states that it is "essential" that "[m]ental health services are available for all inmates who require them." The standard explains that "[i]n the correctional setting, as in most other environments, the immediate objective of mental health treatment is to alleviate symptoms of mental disorders and prevent relapses in order to sustain patients' ability to function safely in their environment."

95. NCCHC Jail Standard J-G-02 states that it is "essential" that "[a]ny practice of segregation should not adversely affect an inmate's health." The standard provides that, "[u]pon notification that an inmate has been placed in segregation, [a] qualified health care professional reviews the inmate's health record." The standard explains that "[c]hecks by health staff must be done to ensure that each segregated inmate has the opportunity to request care for medical, dental, or mental health problems. These visits also enable health staff to ascertain the inmate's general medical and mental health status. Inmates often experience irritability, anxiety, or a dysphoric mood within weeks of placement in social isolation." The standard cautions that "[s]pecial attention should be given to vulnerable populations, such as adolescents and the mentally ill." The standard also warns that "[d]ue to the possibility of injury and depression during isolation, the evaluations by health staff should include notation of bruises or other trauma markings, comments regarding the inmate's attitude and outlook (particularly as they might relate to suicidal ideation), and any health complaints."

96.     NCCHC Mental Health Standard MH-E-07 states it is "essential" that "[t]he mental health of segregated inmates is monitored regularly." The standard provides in relevant part:

a. "On notification that an inmate is placed in segregation, mental health staff reviews the inmate's mental health record to determine whether existing mental health needs contraindicate the placement or require accommodation. Such review is documented in the clinical record;"

b. "For inmates housed in segregation, qualified mental health professionals provide mental health services according to established treatment plans and respond in a timely manner to referrals;" and

c. "Inmates who are segregated and have limited contact with staff or other inmates are monitored 3 days a week by a medical or qualified mental health professional."

The standard explains that "[t]he intent of this standard is that mental health staff monitor segregated inmates for signs of mental or physical decompensation. Persons in segregated environments are vulnerable to mental illness and often experience irritability, anxiety, or depression." The standard notes that "[i]t is important to coordinate procedures to ensure that segregated inmates who are on the mental health caseload are appropriately monitored and managed." The standard wards the "[b]ecause segregation can exacerbate preexisting conditions, staff should be extra cautious when placing vulnerable inmates in segregation." The standard also cautions that "[m]ental health staff should provide medical and custody staff with clear guidelines regarding behaviors, verbal statements, medication refusals, and cell conditions that require a mental health referral." The standard points out that "[m]any correctional systems screen for the presence of serious mental illness so that such inmates are not eligible for * * * long-term placement in segregation."

97.     As a result of the defendants' conduct, which was perpetrated intentionally, recklessly, wantonly, fraudulently, oppressively, and or with reckless disregard for the rights of Plaintiff and others, and which is so despicable that it is despised by ordinary people, Plaintiff suffered all of the damages mentioned herein, including wrongful death, loss of society and

affection, humiliation, fear, feelings of degradation and helplessness, sleeplessness, anguish, despair, fright, severe mental and emotional distress, depression, distrust, and embarrassment in violation of his federal constitutional rights and his rights under the laws of the State of California, and Plaintiffs are entitled to punitive damages.

98.     Each Defendant participated in the violations alleged herein, or directed the violations alleged herein, or knew of the violations alleged herein and failed to act to prevent them and failed to intervene. Each defendant ratified, approved and acquiesced in the violations alleged herein.

99.     As joint actors with joint obligations and agents of each other, each defendant was and is responsible for the failures and omissions of the other.

**<u>1st Claim for Relief  42 U.S.C. § 1983 – 4th and 14th Amendments</u>**

Against all Defendants

100.     Plaintiffs reallege and incorporate by reference each and every allegation contained in this complaint, as though fully set forth herein.

101.     At the time of the incident set forth in the averments above, the rights of persons within the jurisdiction of the United States of America under both Amendment IV and XIV to the United States Constitution to freedom from unreasonable seizure and to due process of law and the equal protection of the laws, were in force and effect and the individual defendants who engaged in conduct, as set forth above, who deprived Decedent and Plaintiffs of their right to due process and equal protection, and exposed Decedent to the use of excessive and unreasonable force, deprived plaintiffs individually and as the successor in interest of their son of constitutional rights, violated those rights, and violated Amendment XIV to the United States Constitution. The decedent was a pretrial detainee and was protected by the Fourteenth Amendment under an objective standard, under *Castro. Kingsley v. Hendrikson*, 576 U.S. 389 (2015) and *Castro v. County of Los Angeles*, 844 F.3d 1060 (9th Cir. 2016) (*en banc*).

102.     The use of this excessive force amounts to punishment.

103.    Plaintiffs also asserts this claim under the substantive component of the due process clause of the Fourteenth Amendment because the actions and conduct of the defendants shocks the conscience.

104.    By the actions and omissions described above, the individually named Defendants violated 42 U.S.C. § 1983, depriving Plaintiff and Decedent of the following well-settled constitutional rights that are protected by the First, Fourth, and Fourteenth Amendments to the U.S. Constitution:

    a.  The right to be free from an unreasonable ongoing seizure and from the use of excessive force as a pretrial detainee, as secured by the Fourth and Fourteenth Amendments; and

    b.  The right to life under the Fourteenth Amendments;

    c.  The right to substantive due process of law under the Fourteenth Amendments.

105.    The Defendants' failure to intervene, prevent, or stop the constitutional violations by others, when Defendants were in a position to so intervene when such violations were occurring, also renders such Defendant(s) liable for these violations; this includes defendants employed by Defendant KCHA.

106.    Defendants subjected Plaintiff to their wrongful conduct, depriving Plaintiff and Decedent of the rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Plaintiffs (Individually and on behalf of Julien Deveroux) and others would be violated by their acts and or omissions.

107.    As a proximate result of the foregoing wrongful acts and or omissions, Decedent and Plaintiffs sustained injuries and damages and Plaintiffs are therefore entitled to general and compensatory damages in an amount to be proven at trial.

108.    In committing the acts alleged above, the individually named Defendants and Doe Defendants acted maliciously, oppressively, fraudulently, wantonly and with a reckless disregard for the rights and safety of the Decedent and others, and by reason thereof, Plaintiffs are entitled to punitive damages and penalties allowable under 42 U.S.C. § 1983, California Code of Civil

Procedure §§ 377.20 et seq, and other state and federal law against these individual Defendants.

**2nd Claim for Relief  42 U.S.C. § 1983 – 1st, 4th and 14th Amendments**

Against all Defendants

109.    Plaintiffs reallege and incorporate by reference each and every allegation contained in this complaint, as though fully set forth herein.

110.    By the actions and omissions described above, Defendants, acting under the color of state law in their individual capacities, deprived Julien Deveroux as a pretrial detainee of the rights, privileges, and immunities secured by the Fourteenth Amendment by subjecting him, or through their deliberate indifference, allowing others to subject him, to delay and denial of access to medical care for a serious medical condition.

111.    The Defendants knew or the Deputies they were responsible for supervising knew that Julien Deveroux's medical condition was serious, and that he should not be housed in a cell with only one hour observations and these Defendants knew or must have known that, after he was observed lying supine on the concrete floor, he required access and delivery to urgently needed medical care; Defendants further had a duty to provide Julien Deveroux with reasonable security and safe, appropriate housing and monitoring to accommodate his mental health and medical conditions.

112.    Defendant McRoberts and other defendants with unknown identities also failed to make the one-hour checks required.

113.    The Defendants ignored, delayed, or denied to Julien Deveroux appropriate and safe housing, and urgently needed medical care and treatment. As a result of the Defendants' deliberate indifference to Julien Deveroux's need for appropriate housing and monitoring and or his need for medical care and treatment, Plaintiffs suffered damages and deprivation of constitutional rights, as described herein.

114.    Nurse Doe abdicated his/her duty to monitor Julien Deveroux and to monitor his general state of health in addition to his mental health by failing to undertake proper protocol and to make the proper checks on Julien Deveroux.

115.    Nurse Doe in concert with other to-be-identified defendants was also instrumental in failing to place Julien Deveroux on suicide watch; had Julien Deveroux been on suicide watch, he would have received the care he needed for his severe mental illness and would not have been in a place where he could be subjected to the use of excessive force or left to die by KCSO deputies, including Defendant McRoberts, who were only required to make one hour checks on him.

116.    The confluence of all of the decisions and actions of all of the defendants means that each of the defendants made an intention decision with respect to Julien Deveroux's conditions of confinement, those conditions placed Julien Deveroux at substantial risk of suffering serious harm, the defendant did not take reasonable available measures to abate that risk even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved and, by not taking such measures, caused the injuries to Julien Deveroux, culminating in his death.

117.    By the actions and omissions described above, the individually named Defendants violated 42 U.S.C. § 1983, depriving Plaintiff and Decedent of the following well-settled constitutional rights that are protected by the First, Fourth, and Fourteenth Amendments to the U.S. Constitution:

    a.  The right to be free from an unreasonable ongoing seizure as a pretrial detainee, as secured by the Fourth and Fourteenth Amendments;

    b.  The right to be free from deliberate indifference to Julien Deveroux's serious medical needs while in custody and confined in jail as a pretrial detainee, as secured by the Fourth and Fourteenth Amendments;

    c.  The right to be free from wrongful governmental interference with familial relationships and Plaintiff's right to companionship, society, and support, as secured by the First and Fourteenth Amendments.

118.    The listed Defendants' failure to intervene, prevent, or stop the constitutional violations by others, when Defendants were in a position to so intervene when such violations were occurring, also renders such Defendant(s) liable for these violations.

119.    Defendants subjected Plaintiff to their wrongful conduct, depriving Plaintiff and Decedent of the rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Plaintiff (Individually and on behalf of Julien Deveroux) and others would be violated by their acts and or omissions.

120.    As a proximate result of the foregoing wrongful acts and or omissions, Plaintiff sustained injuries and damages, as set forth above. Plaintiffs are therefore entitled to general and compensatory damages in an amount to be proven at trial.

121.    In committing the acts alleged above, the individually named Defendants and Doe Defendants acted maliciously, oppressively, fraudulently, wantonly and with a reckless disregard for the rights and safety of the Decedent and others, and by reason thereof, Plaintiffs are entitled to punitive damages and penalties allowable under 42 U.S.C. § 1983, California Code of Civil Procedure §§ 377.20 et seq, and other state and federal law against these individual Defendants.

**3rd Claim for Relief  42 U.S.C. § 1983 – Deprivation of Freedom of Association and Substantive Due Process Rights in Violation of the First and Fourteenth Amendments to the Constitution of the United States of America – Loss of Parent/Child Relationship (42 U.S.C. § 1983)**

Against All Defendants

122.    Plaintiffs reallege and incorporate by reference the allegations contained in all paragraphs in this pleading as though fully set forth herein.

123.    The aforementioned acts and or omissions of Defendants in using excessive force against and imposing an unreasonable seizure of Julien Deveroux and being deliberately indifferent and callous to Julien Deveroux's serious medical needs, health and safety, violating his constitutional rights, and their failure to train, supervise, and or take other appropriate measures to prevent the acts and or omissions that caused the untimely and wrongful death of Julien Deveroux

deprived Plaintiffs of their liberty interests in the parent-child relationship in violation of their substantive due process rights as defined by the First and Fourteenth Amendments to the United States Constitution.

124.    This conduct of the defendants also violated the substantive component of the Due Process Clause of the 5th and 14th Amendments because it was arbitrary and it shocks the conscience. *See County of Sacramento v. Lewis*, 523 U.S. 833 (1998).

125.    The First and Fourteenth Amendments protect certain intimate human relationships that presuppose deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life. Julien Deveroux was one such individual for his mother, Jennifer Valle, and for his father Alain Deveroux; as a result of the wrongful conduct of the Defendants, Plaintiffs suffered physical and emotional pain, and mental distress and pain, including emotional trauma, fear, extreme emotional distress, grief, anxiety, shock, heartbrokenness, worry, sleeplessness, depression, loss of enjoyment of life, loss of services, society, care and protection of the decedent, and loss of economic security.

126.    As a direct and proximate result of the aforementioned acts and/or omissions of Defendants, Plaintiffs suffered injuries and damages as alleged herein.

**4th Claim for Relief  42 U.S.C. § 1983 – Local Governing Body and Supervisory Liability**

Against Defendants KCO, KCHA, Sheriff Youngblood, Jane Roe, Richard Roe, John Doe, and Does 1-20

127.    Plaintiffs reallege and incorporate by reference each and every allegation contained in this complaint, as though fully set forth herein.

128.    Under California decisional law, there existed a special relationship between the County of Kern, the Kern County Sheriff's Office and Defendant Youngblood on the one hand, and Julien Deveroux, on the other during the time when Julien Deveroux was an inmate in jails owned and operated by the county and managed by Defendant Youngblood, giving rise to a legal duty of care to Julien Deveroux.

129.     As supervisors, Defendants Youngblood, Jane Roe and Richard Roe and Does 1-20, each permitted and failed to prevent the unconstitutional acts of other Defendants and individuals under their supervision and control, and failed to properly supervise such individuals, with deliberate indifference to the rights and serious medical needs of Julien Deveroux. Each of these supervising Defendants either directed his or her subordinates in conduct that violated Decedent's rights, or set in motion a series of acts and omissions by his or her subordinates that the supervisor knew or reasonably should have known would deprive Decedent of rights, or knew his or her subordinates were engaging in acts likely to deprive Decedent of rights and failed to act to prevent his or her subordinate from engaging in such conduct, or disregarded the consequence of a known or obvious training deficiency that he or she must have known would cause subordinates to violate Decedent's rights, and in fact did cause the violation of Decedent's rights. (See, Ninth Circuit Model Civil Jury Instruction 9.4). Furthermore, each of these supervising Defendants is liable in their failures to intervene in their subordinates' apparent violations of Decedent's rights.

130.     Plaintiff alleges that the unconstitutional actions and or omissions of the individually named KCO and KCHA Defendants, and the personnel acting on behalf of KCO and or KCHA, were done pursuant to the following customs, policies, practices and or procedures of KCO and or KCHA, stated in the alternative, which were directed, encouraged, allowed, and or ratified by policy making officials for KCO and KCHA and KCSO, including, but not limited to, the Sheriff and Does 1-20:

    a.  To deny pretrial detainees at the KCO jails access to appropriate, competent, and necessary care for serious medical needs, including by failing to allocate sufficient resources for medical care in its Jail and failing to adequately staff its Jail with sufficient competent and trained medical professionals, including Medical Doctors, and by failing to require that all medical staff and supervisors at the jail be properly trained, supervised, credentialed, and licensed as required by law;

    b.  To fail to properly classify, house, and or monitor inmates suffering from mental health

disabilities and medical conditions and, specifically, pretrial detainees who are suicidal, who have attempted suicide, as did Julien Deveroux and who have been found to be incompetent to stand trial by a court of law, including placement in safe cells, with safe and appropriate bedding under the circumstances, including failing to consider in any way the clear and obvious danger of placing inmates at risk of injury, self-inflicted or accidental, in cells with means to injure themselves;

c.  To fail to properly train staff when an inmate needs to be promptly taken to the closest urgent care trauma center, and to fail to have necessary and appropriate policies to ensure that inmates with injuries are not left untreated;

d.  To fail to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described in this Complaint and in subparagraphs (a) through (c) above, when the need for such was obvious, with deliberate indifference to the rights and safety of Plaintiff, Decedent, and the public, and in the face of an obvious need for such policies, procedures, and training programs.

131.    In the alternative Defendants KCO and KCHA may have instituted policies or training addressing some or all the topics listed above, but with deliberate indifference to citizens' rights, failed to properly oversee, enforce, and or properly carry out such policies and or training.

132.    The above-described customs, policies, practices, and or procedures of KCO and KCHA were a moving force and or a proximate cause of the deprivations of Plaintiff's and Decedent's constitutional rights, in violation of 42 U.S.C. § 1983, as more fully set forth above in the Claims for Relief.

133.    Defendants KCO and KCHA are also liable for the violations of Plaintiffs' and Decedent's rights by their final policy makers, including the Sheriff and Does 1-20, as described in this pleading. (See, Ninth Circuit Model Civil Jury Instruction 9.6).

134.    KCO and KCHA conducted investigations and reviews of this matter concerning the death of Julien Deveroux, and the Sheriff and Does 1-20 directly and personally participated in

such investigations and reviews. The unconstitutional actions and or omissions of the individually named Defendants, Does 1-20, other Sheriff's Department and KCO personnel, and KCHA personnel, as described above, were approved, tolerated, and or ratified by policy making officials for KCO and KCHA, including, but not limited to, the Sheriff and Does 1-20. Plaintiffs are informed and believes, and thereupon alleges, the details of this incident have been revealed to the authorized policy makers within KCO, the Kern County Sheriff's Office, and KCHA, and that such policymakers have direct knowledge of the fact that Julien Deveroux wrongfully died in KCO's jail, and was unlawfully denied necessary care for his serious medical needs due to their and their subordinates' deliberate indifference and violations of Decedent's rights. Notwithstanding this knowledge, the authorized policymakers within KCO, KCSO, and KCHA, have approved of the conduct of the individually named Defendants and Does 1-20 and their decisions in this matter to the extent such individuals were under their supervision and oversight, and have made a deliberate, conscious, and affirmative choice to endorse and ratify such conduct and decisions, and the basis for them, which resulted in the death of Julien Deveroux. By so doing, the authorized policymakers within KCO and its Sheriff's Office, as well as those within KCHA, have shown affirmative agreement with the conduct of individual Defendants and other employees/agents under their supervision, and have ratified the unconstitutional acts of these individual Defendants, employees, and agents.

135.    The aforementioned customs, policies, practices, and procedures; the failure to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline; and, the unconstitutional orders, approvals, ratification, and toleration of wrongful conduct of Defendants KCO, KCHA, the Sheriff, McRoberts, Jane Roe, Richard Roe, John Doe, and Does 1-20 were a moving force and or a proximate cause of the deprivations of Plaintiffs' and Decedent's clearly established and well-settled constitutional rights, in violation of 42 U.S.C. § 1983, as more fully set forth above and in this pleading.

### 5th Claim for Relief — California Civil Code § 52.1

Against Defendants KCO, Youngblood, McRoberts, John Doe, Jane Roe, Richard Roe, Nurse Doe

<u>and Does 1-20</u>

136.    Plaintiffs reallege and incorporate by reference the allegations contained in this complaint, as though fully set forth herein.

137.    By their acts, omissions, customs, and policies, Defendants, acting in concert or in a conspiracy, as described above, and with threats, intimidation, and or coercion, violated Plaintiffs' and Decedent's rights under California Civil Code § 52.1 and the following clearly established rights under the United States Constitution and California Constitution and law:

a.  Decedent's right to be free from an unreasonable ongoing seizure as a pretrial detainee, as secured by the Fourth and Fourteenth Amendments to the United States Constitution and the California Constitution, Article 1, Sections 7 and 13;

b.  Decedent's right to be free from deliberate indifference to his serious medical needs while in custody as a pretrial detainee, as secured by the Fourteenth Amendment to the United States Constitution and the California Constitution, Article 1, Section 7;

c.  Plaintiff's right to be free from wrongful government interference with familial relationships and Plaintiffs' right to companionship, society, and support of each other, as secured by the First and Fourteenth Amendments;

d.  The right to enjoy and defend life and liberty; acquire, possess, and protect property; and pursue and obtain safety, happiness, and privacy, as secured by the California Constitution, Article 1, Section 1;

e.  The right to protection from bodily restraint, harm, or personal insult, as secured by California Civil Code § 43; and

f.  Decedent's right to medical care as required by California Government Code § 845.6.

138.    Separate from, and above and beyond, Defendants' attempted interference, interference with, and violation of Plaintiff's and Decedent's rights, Defendants violated Plaintiff's and Decedent's rights by the following conduct, among other conduct, constituting threat, intimidation, or coercion:

a.  Intentionally and with deliberate indifference, depriving and or preventing Decedent from receiving necessary, life-saving medical care and treatment;

b.  Intentionally and with deliberate indifference, causing Decedent to languish in jail without necessary/proper medical/psychiatric/pharmacological care, in a cell and on a bunkbed that constituted an unreasonably dangerous condition under the circumstances, even after a preliminary screening at the jail had revealed she was a serious threat to herself;

c.  Intentionally and with deliberate indifference, doing and or permitting subparagraphs (a) – (b) when it was also obvious that in doing so, Decedent's life was likely to end needlessly, and Plaintiff's rights as Decedent's surviving spouse also would be violated.

139.    To the extent this claim is based on a violation of Decedent's rights, it is asserted as a survival claim. To the extent that the violations of rights were done to Plaintiffs, it is asserted as a wrongful death claim. To the extent the violations were done to both Decedent and Plaintiffs, it is asserted as both survival and wrongful death.

140.    Defendant KCO is vicariously liable pursuant to California Government Code section 815.2.

141.    As a direct and proximate result of Defendants' violation of California Civil Code § 52.1 and of Plaintiff's and Decedent's rights under the United States and California Constitutions and law, Plaintiff sustained injuries and damages, and against each Defendant named in this Claim for Relief is entitled to relief as set forth above, and punitive damages against all individual Defendants, including all damages and penalties allowed by California Civil Code §§ 52 and 52.1 and California law, three times actual damages, and attorneys' fees.

### 6th Claim for Relief — California Government Code § 845.6

Against Defendants KCO, KCHA, Youngblood, McRoberts, John Doe, Jane Roe, Richard Roe, Nurse Doe and Does 1-20

142.    Plaintiffs reallege and incorporate by reference the allegations contained in this

complaint, as though fully set forth herein.

143.    The Defendants named in this Claim for Relief knew or had reason to know that Julien Deveroux required appropriate and safe housing accommodations necessary for his safety and well-being under the circumstances, and knew or had reason to know that he was in need of immediate medical care, evaluation, diagnosis, treatment, and close observation, and close monitoring, and each Defendant failed to take reasonable action to summon and or to provide him access to the requisite level of medical care and treatment that he required. Each such individual Defendant, employed by and acting within the course and scope of his or her employment with Defendants KCO and or KCHA, knowing and or having reasons to know this, failed to take reasonable action to summon and or provide Julien Deveroux access to such medically appropriate care and treatment, in violation of California Government Code § 845.6.

144.    As a proximate cause of the aforementioned acts and omissions of – and attributable under Government Code sections 845.6 and 815.2 to all Defendants – Plaintiffs were injured as set forth above, and are entitled to all damages allowable under California law. Plaintiffs sustained serious and permanent injuries and is entitled to damages, penalties, costs, and attorneys' fees as set forth above and as otherwise provided for by law.

### **7th Claim for Relief — Negligence and Wrongful Death**

#### Against All Defendants

145.    Plaintiffs reallege and incorporate by reference the allegations contained in this complaint, as though fully set forth herein.

146.    All defendants were subject to a duty of care to protect Julien Deveroux and other persons in their custody and to avoid causing unnecessary physical harm and death to such persons; the wrongful conduct of the defendants, as alleged herein, did not comply with the standard of care to be exercised by reasonable persons and as such breached Defendants' duty, causing the death of Julien Deveroux and causing Plaintiffs to suffer harm. Julien Deveroux's death was a direct and proximate result of the aforementioned wrongful and negligent acts and

omissions of Defendants; Defendants' acts and omissions thus were also a direct and proximate cause of Plaintiff's injuries and damages, as alleged herein.

147.    These general duties of reasonable care and due care owed to Julien Deveroux by all Defendants include, but are not limited, to the following specific obligations:

a.  To provide safe and appropriate jail housing and supervision for Julien Deveroux, including reasonable classification, monitoring, and housing, including placing his in an appropriate bed, and avoiding physical conditions of any housing that could foreseeably precipitate or facilitate harm to him;

b.  To not expose Julien Deveroux to unreasonably dangerous conditions under the circumstances, which foreseeably could expose the Decedent to serious injury or death, as described in this pleading, *supra*;

c.  To obey regulations, standards, practices, procedures, and Court Orders for the care and safety of inmates, such as Julien Deveroux;

d.  To summon necessary and appropriate medical care for Julien Deveroux;

e.  To use generally accepted law enforcement and jail procedures that are reasonable and appropriate for the Decedent's medical conditions and needs, as well as the Decedent's status as a pretrial detainee and as a suicidal, incompetent to stand trial, mentally ill and emotionally disturbed person;

f.  To refrain from abusing their authority granted to them by law; and,

g.  To refrain from violating Plaintiffs' rights guaranteed by the United States and California Constitutions, as set forth above, and as otherwise protected by law.

148.    By the acts and omissions set forth more fully in the paragraphs above, Defendants acted negligently and breached their duty of due care owed to Julien Deveroux, which foreseeably resulted in the suffering of damages by Julien Deveroux and Plaintiffs.

149.    Defendants KCO and KCHA are vicariously liable pursuant to California Government Code section 815.2.

150.    As a direct and proximate result of Defendants' wrongful and negligent acts and

omissions, Plaintiff incurred expenses for funeral and burial expenses in an amount to be proven.

151.    As a proximate result of Defendants' negligence, Plaintiffs sustained injuries and damages, and against each listed Defendant in this Count is entitled to the relief described above, and as otherwise allowed by law. Plaintiff also seeks punitive damages against such individual Defendants in their individual capacities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief against each and every Defendant herein, jointly and severally:

1.    Compensatory damages, special damages and general damages, including damages for loss of enjoyment of life and loss of life, in an amount according to proof;

2.    Punitive damages under 42 U.S.C. § 1983, federal law, and California law, in an amount according to proof and in an amount to deter future misconduct of the type engaged in by the defendants;

3.    All other damages, penalties, costs, interest, and attorneys' fees, as allowed by 42 U.S.C. §§ 1983 and 1988; California Code of Civil Procedure §§ 377.20 et seq., 377.60 et seq., and 1021.5; California Civil Code §§ 52 et seq., and 52.1; and as otherwise may be allowed by California and or federal law; and,

4.    For such other and further relief as the Court deems just and proper.

Dated: February 15, 2023          JDP PC  Jeff Dominic Price

/s/ Jeff Dominic Price
By: Jeff Dominic Price
Attorneys for Plaintiffs

## JURY TRIAL DEMAND

Plaintiffs respectfully demand a jury trial in this action, pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: February 15, 2023          JDP PC  Jeff Dominic Price

/s/ Jeff Dominic Price
By: Jeff Dominic Price
Attorneys for Plaintiffs