1

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9                       EASTERN DISTRICT OF CALIFORNIA

10

11   ALAIN DEVEROUX AND JENNIFER        Case No. 1:23-cv-00239-CDB
     VALLE, individually, and as successors in
12   interest of JULIEN DEVEROUX,       ORDER GRANTING DEFENDANTS'
                                         MOTION FOR SUMMARY JUDGMENT
13                    Plaintiffs,
                                         (Doc. 178)
14           v.
                                         ORDER DENYING PLAINTIFFS' MOTION
15   COUNTY OF KERN, *et al.*,           FOR SANCTIONS AS MOOT

16                    Defendants.        (Doc. 180)

17

18           Pending before the Court is the motion of Defendants for summary judgment.  (Doc. 178).

19   Plaintiffs filed an opposition on September 12, 2025.  (Docs. 198-203, 205).  Defendants filed their

20   reply on September 22, 2025.  (Docs. 214, 215).[1]  The Court heard oral argument on October 16,

21   2025, and submitted Defendants' motion.  (Doc. 226).

22           Also pending before the Court is Plaintiffs' motion for sanctions (Doc. 180), which is fully

23   briefed (*see* Docs. 189, 194).  The Court heard oral argument on September 18, 2025, and submitted

24   Plaintiffs' motion.  (Doc. 209).

25   ///

26   ///

27   _____

28   [1] Following the parties' filing of notices consenting to the jurisdiction of a U.S. magistrate judge
     for all purposes, on August 4, 2023, the action was reassigned to the undersigned pursuant to 28 U.S.C. §
     636(c)(1).  (Doc. 44).

**I.      Background**

**A.  Procedural History**

Plaintiffs Alain Deveroux and Jennifer Valle, the parents of Julien Deveroux ("Decedent"), initiated this action with the filing of a complaint on February 15, 2023.  (Doc. 1).  Plaintiffs filed the operative second amended complaint on November 26, 2024.  (Doc. 125).

Plaintiffs included numerous Defendants in this action, many of whom have been dismissed. The following Defendants have been terminated: Woods (*see* docket entry dated November 7, 2024); Amoldeep Kaur (*see* docket entry dated November 22, 2024); Jose Godoy (*see* docket entry dated March 31, 2025); Carlos Quiroz, Deputy Quiroz, Robles, Joaquin Saldana, Robert Woosley, Del Campo, Melissa Patterson (*see* docket entries dated August 8, 2025; August 14, 2025); Carmona, Velasquez, Amparo, Boytis (*see* docket entry dated September 11, 2025); and Nicholas Torrez (*see* docket entry dated September 29, 2025).

The Defendants remaining in the action are the County of Kern, the Kern County Sheriff's Office ("KCSO"), Deputy Artiga, Deputy Covarrubias, Sergeant Balasis, Deputy De La Torre, Deputy Huckabee, Douglas S. Jauch, Eric Levig, Deputy Martinez, Cole Austin McRoberts, Deputy Navarro, Dylan Rice, Cristian Rivera, Sanchez, and Alex Sosa.

On August 7, 2025, Defendants filed a motion for summary judgment with an accompanying statement of facts.  (Doc. 178).  On August 11, 2025, Plaintiffs filed a motion to strike the motion for summary judgment.  (Doc. 182).  After the Court set an expedited briefing schedule (Doc. 185), Defendants filed an opposition (Doc. 189).  The Court denied the motion to strike on August 26, 2025, extended the deadline for Plaintiffs to file their opposition to the motion for summary judgment, and continued the hearing date and pre-trial conference.  (Doc. 192). Plaintiffs filed their opposition and accompanying exhibits, as well as a statement disputing Defendants' statement of facts, and a separate "statement of uncontroverted facts."  (Docs. 198-203, 205). Defendants filed a reply on September 22, 2025, as well as a response to the statement of uncontroverted facts.  (Docs. 214, 215).

Plaintiffs separately filed a request to seal an exhibit accompanying their opposition.  (Doc. 204).  After the Court denied the request (Doc. 207), Plaintiffs filed a request to file the exhibit

1   publicly on the docket, noting that it was Defendants who had marked it confidential during

2   discovery.  (Doc. 212).  The Court then directed Defendants to file a request to seal, or alternatively,

3   a notice of non-opposition.  (Doc. 217).  Defendants filed their request to seal (Doc. 220) on

4   September 26, 2025; the Court denied the request on October 3, 2025 (Doc. 222) and directed

5   Defendants to provide a redacted copy to Plaintiffs, for filing on the docket absent any objections

6   to the redactions.  Plaintiffs filed the redacted exhibit on October 13, 2025.  (Doc. 224).  Plaintiffs

7   filed a notice of errata on October 13, 2025, providing certain exhibit labels not included in the

8   prior filings of the exhibits.  (Doc. 225).

9        The Court convened for hearing on Plaintiff's motion for summary judgment on October

10  16, 2025.  Jeff Dominic Price appeared for Plaintiffs; Stephanie Virrey Gutcher appeared for

11  Defendants.  Following the hearing, the Court took the motion under submission.  (Doc. 226).

12       **B.  Factual Background**

13                    *i.  Statements of Facts and Evidentiary Objections*

14       In connection with the motion for summary judgment, Defendants filed a separate statement

15  of facts, which Plaintiffs responded to by marking said facts as disputed or undisputed.  *See* (Docs.

16  178, 198).  In addition, Plaintiffs filed their own statement of uncontroverted facts, to which

17  Defendants partially responded.  *See* (Docs. 198, 214).  The Local Rules permit the non-moving

18  party to file a concise "statement of disputed facts," setting forth "all additional material facts as to

19  which there is a genuine issue precluding summary judgment or adjudication" and the source

20  thereof.  *See* Local Rule 260(b).  Plaintiffs' statement both sets forth relevant facts in dispute (*see*

21  Doc. 198 ¶ 509) and operates as, in essence, Plaintiffs' own version of a statement of undisputed

22  facts.

23       Additionally, there is no mechanism in the Local Rules permitting Defendants to file a

24  response to any statement of disputed facts filed by non-moving parties (*see* L.R. 260) and, further,

25  in Defendants' response to Plaintiffs' statement, Defendants leave numerous facts blank and

26  without any response.  *See* (Doc. 214).  Thus, the Court will consider Plaintiffs' statement of

27  uncontroverted facts as a statement of disputed facts, where the cited source does, in fact, call said

28  fact in dispute.  The Court notes that, a substantial number of Defendants' objections to Plaintiffs'

statement of uncontroverted facts relate to, either, the form of the evidence (*see* Doc. 214 at 2-4, 15-16), or that Plaintiffs did not state facts establishing how certain safety checks were deficient (*id.* at 7-14). As Plaintiffs cited to evidence in the record, primarily in the form of video footage, regarding the deficiency of certain cell checks, the Court will review the cited evidence to determine whether a question of fact exists, insofar as such evidence is relevant to the Court's decision.

The Court notes that "at the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents." *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 666 (9th Cir. 2021) (quoting *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003)). This means that, "[i]f the contents of a document can be presented in a form that would be admissible at trial—for example, through live testimony by the author of the document— the mere fact that the document itself might be excludable hearsay provides no basis for refusing to consider it on summary judgment." *Id.* (citing *Fraser*, 342 F.3d at 1036-37). Where such evidence is relevant to the Court's decision, the Court will consider possible objections to its admissibility in light of the controlling summary judgment standard.

The parties' statements rely in part on footage from the individual Defendants' body-worn cameras ("BWC") and from facility surveillance, video files of which were lodged with the Court. *See* (Docs. 178, 200). Defendants attach to their motion the declaration of Tanner Miller, the KCSO custodian of records for the facility surveillance footage. (Doc. 178-21).

Separately, Plaintiffs purport to attach a copy of a report prepared by KCSO Nurse Amoldeep Kaur. (Doc. 200 at 4 ¶ 25; Doc. 201 at 2 ¶ 10). However, the Court could locate no such report in Plaintiffs' exhibits. *See* (Docs. 200, 201, 202, 225).

Many of the salient facts relevant to Defendants' encounters with Decedent are not significantly disputed. The facts below are drawn from those marked as undisputed by Plaintiffs, except where noted. Where facts material to the Court's resolution of Defendants' motion are disputed, the Court considers whether the dispute is genuine. For genuinely disputed issues of material fact, the Court accepts the version most favorable to Plaintiffs, as the non-moving party. *Smith v. City of Hemet*, 394 F.3d 689, 693 (9th Cir. 2005). Where evidentiary objections raised by a party are not expressly identified and discussed herein, they are overruled.

1

### ii.  Events Prior to and Concerning Detainment

The claims at issue in this action stem from the in-custody death of Julien Deveroux ("Decedent"), a pretrial detainee who was discovered by correctional staff deceased in his cell during the early morning hours of January 14, 2022.  Decedent "had a significant medical and mental health history, had a history of mental illness and treatment, had medical and mental health problems involving prescription medication and alcohol, and required [and/or] was taking certain medications."  (Doc. 198 ¶ 24).

During an earlier and unrelated period of incarceration, on July 3, 2020, while on suicide watch, a clinician observed that Decedent "had not eaten two of his recent meals.  The clinician requested detention deputies closely monitor [Decedent's] food and beverage intake and keep a food log."  *Id.* ¶ 13.  On September 22, 2020, Decedent was "referred by detention staff for a daily Administrative Segregation welfare check because detention staff observed him being incoherent, and he had been found incompetent to stand trial."  *Id.* ¶ 14.  As of September 24, 2020, Decedent had been "diagnosed with unspecified schizophrenia and unspecified depressive disorder, also Tourette's syndrome, psychotic disorder, and mood disorder."  *Id.* ¶ 15.  "On October 30, 2020, [Decedent] was referred by detention staff for a daily Ad Seg welfare check because detention staff observed [him] behaving incoherently and he has a new 1370[2]."  *Id.* ¶ 16 (alteration in original; quotations omitted).

"On December 9, 2021, it was documented that [Decedent] was experiencing psychosis for over two years and that previous medications included Adderall and Xanax."  *Id.* ¶ 17.  "On December 27, 2021, [Decedent] was admitted at Henry Mayo Newhall Hospital for possible poisoning treatment and a mental health evaluation."  *Id.* ¶ 18.  "On December 28, 2021, [Decedent] verbalized his intent and his method of attempted suicide to his father" and "attempted to commit suicide."  *Id.* ¶¶ 19-20.  After researching "suicide by freezing on the internet" and determining "it was a relatively painless way to die," Decedent went outside in a snowstorm wearing a t-shirt, shorts, and flip-flops, and laid in the snow; he "returned to his house after about an hour,

---

[2] Presumably, referring to California Penal Code § 1370.

5

abandoning his suicide attempt." *Id.* ¶¶ 22-23.

On December 30, 2021, Plaintiff Alain Deveroux "called 911 for assistance regarding his adult son," Decedent. *Id.* ¶ 25. Decedent "had consumed a bottle of wine" and "was pushing his father, asking for additional, above-prescription doses of his medication, and accusing his father of 'hiding evidence.'" *Id.* ¶ 26 (quotations in original). Plaintiff Alain Deveroux "called 911 to prevent further escalation, and he anticipated his son possibly becoming violent, as he had done in the past." *Id.* ¶ 27. Decedent "was on medication for his mental health diagnoses: bipolar, schizophrenia, ADHD, and depression." *Id.* ¶ 28. On December 30, 2021, Decedent was arrested and eventually housed by the County of Kern as a pretrial detainee at Lerdo Pretrial Facility. *Id.* ¶¶ 1-2, 57.

The County of Kern "contracts with Kern Medical to provide medical care to inmates at Kern County jail facilities." *Id.* ¶ 45. "At the time of booking, each inmate is asked a series of questions by a Kern County Hospital Authority [] nurse." *Id.* ¶ 43. If the nurse "determines that an inmate has medical concerns that are out of the ordinary, the nurse will reject the booking and direct a KCSO deputy to transport the inmate to the nearest hospital, usually Kern Medical Center." *Id.* ¶ 44. Jose Godoy, a nurse, "conducted an intake medical screening of [D]ecedent" that same day, noting "no physical problems or injuries that required medical attention." *Id.* ¶¶ 29-30.

"Inmates can ask for sick call slips from KCSO custody personnel while they are doing security checks" and "can request medical or mental health treatment by using sick call slips." *Id.* ¶¶ 46-47. "When a Kern Medical nurse receives a sick call slip from a KCSO deputy, they are provided to a registered nurse who will timely see that individual to determine and arrange the care that is needed." *Id.* ¶¶ 48. "KCSO custody personnel will also leave sick call slips inside the doorway to a housing unit." *Id.* ¶ 49. "If a KCSO custody personnel receives a sick call slip from an inmate, they are required to forward the slip to Kern Medical or CBH[3] personnel." *Id.* ¶ 50.

### iii. Cell Transfer

On January 3, 2022, Decedent "threw a dinner tray out of his cell when a deputy was conducting checks." *Id.* ¶ 31. During the incident, Decedent "repeatedly yelled out to deputies"

---

[3] Presumably, referring to Kern County Correctional Behavioral Health.

challenging them and telling them to "hit him in the head" and to "stop poisoning his food," and that he "was going to turn off the cameras." *Id.* ¶ 34.  After this incident, on January 4, 2022, Decedent was "transferred from [c]ell BD-0107 to another [c]ell BD-0406" and "a mental health referral was made." *Id.* ¶¶ 32, 35.  Defendants Artiga, Covarrubias, Rice, and Balasis "participated in the rehousing process." *Id.* ¶ 36.  They removed Decedent from cell BD-0107, handcuffed him, and immediately walked him to cell BD-0406.  During the transfer, Decedent's "hand was momentarily caught" between bars as his cell door opened.  *Id.* ¶ 39 (citing Declaration of Tanner Miller [Doc. 178-21], Exhibit 1, 2, and 3, "Videos of Cell Movement").  "While he was being escorted to [BD-0406], [Decedent] yelled many things, including 'it hurts!', 'ah!', and 'please help!'." *Id.* ¶ 37.  Decedent "was not bleeding after the cell movement." *Id.* ¶ 40.

"None of the deputies who [were] present during the cell movement made any referral for medical care." *Id.* ¶ 38.  After the transfer, Defendant Dylan Rice "made a referral to Kern County Behavioral Mental Health." *Id.* ¶ 33.[4]  On January 5, 2022, "Nicholas Torrez conducted a Behavioral Health Screening Assessment of [Decedent]," observing dried blood on his clothing and that he was incoherent. *Id.* ¶¶ 131-133.  Torrez "stated a 'sick call' appointment would be requested on behalf of [Decedent]." *Id.* ¶ 134.  Torrez "did not review prior medical records in advance of the assessment," "did not place [Decedent] on a suicide watch," and "noted that Decedent refused behavioral health services, and refused to participate in the assessment process." *Id.* ¶¶ 135-137.  Torrez "never requested a 'sick call' and Decedent never received medical care from any physician or psychiatrist or nurse after this assessment." *Id.* ¶ 138.

### iv.   Wheelchair Incident

On January 4, 2022, a felony arraignment hearing was set for Decedent in state court, though Decedent "refused to be transported to court due to feeling sick." *Id.* ¶ 51 (citation and quotation omitted).  According to a Detentions Senior Deputy at the Lerdo Pretrial Facility, inmates there who refuse court are not automatically referred for a sick call, unless they ask for a sick call. *Id.* ¶ 53.  Thereafter, the court "authorized KCSO to use 'reasonable force' to transport [Decedent] to

---

[4] Although Defendants Artiga, Covarrubias, and Balasis assert they were aware of Rice's referral (*id.* ¶ 140), the Court sustains Plaintiffs' evidentiary objection as the evidence cited in support thereof (Rice's declaration) does not demonstrate their personal knowledge of the referral.

court and continued the arraignment to January 6, 2022. No deputy requested a sick call or otherwise summoned medical care for [Decedent] following his court refusal due to feeling sick." *Id.* ¶ 52. On January 5, 2022, Decedent appeared before the Superior Court of California, County of Kern, concerning a violation of his probation terms. Decedent addressed the court, though his language was largely confused and nonresponsive. His counsel declared a doubt and the court suspended the proceedings pursuant to California Penal Code § 1368, appointed physician Gary Longwith to evaluate Decedent, and continued the hearing to January 27, 2022. *See* (Doc. 202-16).

"On January 6, 2022, [Decedent] again refused to be transported to court." (Doc. 198 ¶ 55). The court then "appointed Dr. [] Longwith to examine and evaluate [Decedent] pursuant to [California] Penal Code § 1368, and continued the matter to January 7, 2022." *Id.* ¶ 56. That day, Decedent "was transferred to Lerdo Pretrial Facility Cell C-404" and "again refused to be transported to court." The court "again authorized KCSO to use 'reasonable force' to transport him to court and continued the hearing to January 11, 2022." *Id.* ¶ 58. On January 10, 2022, Dr. Longwith "went to Lerdo to evaluate [Decedent] and informed KCSO custody personnel at Lerdo that he was present to conduct a medical evaluation of [Decedent]; Lerdo custody personnel informed Dr. Longwith that [Decedent] refused to exit his cell." *Id.* ¶ 59; (Doc. 214 ¶ 516).

On the morning of January 11, 2022, Decedent "paced around the holding cell for approximately an hour … while waiting for court transportation." (Doc. 198 ¶ 63). Decedent "was walked to the transport bus in the morning" that would take him to court.[5] *Id.* ¶ 62. "KCSO deputies transported [Decedent] to court for his arraignment; at the arraignment a plea of not guilty was

---

[5] Plaintiffs dispute this fact on the grounds that the Decedent "was walking but was being assisted by two deputies," citing to Plaintiffs' Exhibit 40. (Doc. 198 ¶ 62A). Exhibit 40, however, does not show these events as the video footage begins in the afternoon of January 11, 2022, and does not depict that morning. Exhibit 48, however, does depict the morning of January 11, 2022. It is sufficiently clear from reviewing the video evidence contained in Exhibit 48 that though Decedent is being escorted by officers, with one officer holding onto each of his arms while transporting him to the bus (Doc. 202, Ex. 48 at 7:28:18.147 AM to 7:29:29.437 AM), Decedent is not being carried, dragged, or otherwise significantly supported and appears to substantially support his own weight while walking to the bus. Additionally, Decedent was ambulating by himself and without assistance in a holding cell earlier that morning. *Id.* at 4:42:01.980 AM to 5:25:49.713 AM). *See Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) (on summary judgment, "the court has discretion in appropriate circumstances to consider other materials, [but] it need not do so"). Accordingly, the evidence cited by Plaintiffs does not place this fact in genuine dispute.

1   entered [] by his attorney, and his attorney declared a doubt as to the competency of [Decedent] to

2   stand trial," with the court granting counsel's motion for a competency evaluation pursuant to

3   California Penal Code §§ 1367-1368, and "criminal proceedings were suspended." *Id.* ¶ 60.  During

4   the arraignment, Decedent's attorney appeared with Decedent in court and "did not observe that

5   [Decedent] was ill" nor recalled "seeing [Decedent] with bloody hands." *Id.* ¶¶ 68-70.

6        Upon return of the transport bus to the facility, Defendant De La Torre was waiting outside

7   the transport van with other deputies for several minutes while Defendant Rivera was obtaining a

8   wheelchair.  (Doc. 214 ¶ 596).[6]  Both Defendants De La Torre and Rivera were present when

9   Decedent was assisted from the transport van to a wheelchair and, while Rivera handled the

10  wheelchair, De La Torre assisted Decedent to sit down in the wheelchair.  *Id.* ¶¶ 597-98.

11  "Defendant Rivera wheeled [Decedent] to a cell." (Doc. 198 ¶ 61).  "Defendant Sosa was present

12  when [Decedent was] being taken by wheelchair to [c]ell C-216." (Doc. 214 ¶ 599).

13                           *v.  Cell Checks*

14       During the period between January 2022 and March 2022, the Lerdo Pretrial Facility was

15  "experiencing a high volume of COVID cases … Inmates who were observed to be sick were not

16  taken to Court during COVID" and "deputies were trained during COVID to watch for symptoms

17  of sickness." *Id.* ¶¶ 65-67.  On January 13, 2022, at approximately 6:30 p.m., Deputy Amparo

18  "recalls conducting a security check" where he "checked on [Decedent] and looked into cell C-216

19  through the window." *Id.* ¶¶ 104-105.  Amparo "observed [Decedent] lying down in the back of

20  the cell, towards the right side, between the desk and the wall," "lying with his chest toward the

21  door on his left side" and his "right hand was on his desk seat." *Id.* ¶¶ 106-108.  Amparo observed

22  that Decedent "appeared to be asleep" and "could see his chest rising and falling," and that

23  Decedent "did not appear to be in distress." *Id.* ¶¶ 109-111.

24       That same day, Defendant McRoberts was "assigned as the C-pod floor deputy at the Lerdo

25  Pre-Trial Facility." *Id.* ¶ 71.  "At approximately [7:25 p.m.], [Defendant McRoberts] began body

26  count in C-pod with [Defendant De La Torre].  During inmate count, [deputies] ensure that all

27

28       [6] These events are depicted in Exhibit 3 of Plaintiffs' opposition, containing video surveillance
    footage.  *See* (Doc. 200, Ex. 3 at 3:13:49.667 PM).

1    inmates are moving around and present in their cells.  When walking by cell C-216, [McRoberts]

2    saw [Decedent] sitting on his bunk.  [Decedent] was awake and moving around." *Id.* ¶ 74.

3    Defendant De La Torre conducted "four security checks during his shift," between approximately

4    7 p.m. and 11 p.m., "two on the top tier and two on the bottom." *Id.* ¶¶ 92-93.  "During his second

5    security check after meds pass, he walked by [Decedent's] cell and noticed him lying on the floor

6    towards the back of the cell with both legs on the floor." *Id.* ¶ 94.  During his last check, "he noticed

7    [Decedent] still laying towards the back of the cell but he had put one of his legs to rest on the top

8    of the bottom bunk bed and was in a different position than the last time he was checked on." *Id.*

9    ¶ 95.

10    "At approximately [9:23 p.m.], [McRoberts] went into C-pod unit 6 to begin a security

11    check.  While walking by cell C-216, [McRoberts did not] recall what [Decedent] was doing in his

12    cell." *Id.* ¶ 75.  "At [10:22 p.m.], [De La Torre] conducted the security check downstairs while

13    McRoberts conducted the security check on the top tier, so McRoberts did not have contact with

14    [Decedent]." *Id.* ¶ 76.[7]  "At approximately [11:22 p.m.], McRoberts began a security check in C-

15    pod.  McRoberts does not recall the details of what [Decedent] was doing … At approximately

16    [12:21 a.m., January 14, 2022], McRoberts began a security check in C-pod.  McRoberts [does not]

17    recall what [Decedent] was doing … At approximately [1:20 a.m.], McRoberts began security

18    check in C-pod.  McRoberts remembers seeing [Decedent] lying on the floor under his desk, fully

19    clothed.  McRoberts recalls seeing [Decedent's] arms move, and he appeared to be falling asleep.

20    [Decedent] did not appear to be in distress." *Id.* ¶¶ 76-79.  "C-pod is a unit that houses many

21    inmates with psychiatric issues, and it is not abnormal for an inmate to fall asleep on the floor in

22    various areas of their cell … Inmates in administrative segregation are known to have irregular

23    sleeping patterns, sometimes sleeping more or less than the average person." *Id.* ¶¶ 80-81.

24    "Video shows McRoberts missed the 2:28 a.m. security check at [Decedent's] door during

25

26    _____

27    [7] A review of the video evidence does not reflect that Defendant McRoberts conducted any such
checks at 10:22 p.m. on January 13, 2022.  A deputy is observed conducting a check on the lower tier at
10:21:48.407 p.m. to 10:23:55.623 p.m. on January 13, 2022, but no deputy checks the top tier at this time
28    or in close proximity in time to the check of the lower tier.  (Doc. 202, Ex. 47).  Defendant McRoberts'
actual check was at 10:26:24.923 p.m. *See id.*; *see also* (Doc. 224 at 15).

1    meds pass."[8]  *Id.* ¶ 83.  "Video shows McRoberts standing at [Decedent's] door at 3:30 [a.m.]  He

2    whistles and yells 'food' while tapping on [Decedent's] door … Video shows McRoberts stands at

3    [Decedent's] door at 4:21 [a.m.]  He calls out his name before standing there a few seconds before

4    walking away."[9]  *Id.* ¶¶ 84-85.

5         "At approximately [5:09 a.m.], McRoberts started a security check in C-pod" and, when

6    walking by cell C-216, "saw [Decedent] lying on the floor, appearing to be asleep.  At this time,

7    McRoberts noticed [Decedent's] skin color seemed pale."  *Id.* ¶ 87.  "McRoberts did not want to

8    open cell C-216 by [himself] to check [Decedent's] welfare because he was a high-security risk …

9    McRoberts went to unit [three] to notify Detentions Deputy [Parker] to respond to cell C-216 with

10   [him] so [they] could open his door … [Parker] and McRoberts went to cell [C-216] and had the

11   C-pod control room officer open the door.  Upon entry to the cell, it was clear that [Deveroux] was

12   having some type of medical emergency due to his skin color."  *Id.* ¶¶ 88-90.  "McRoberts called a

13   medical priority via [his] handheld radio device.  While calling a medical priority, [Parker] noticed

14   [Decedent's] skin felt cold.  [Parker] called for master control to dispatch paramedics via his

15   handheld radio device at [5:28 a.m.]."  *Id.* ¶ 91.  "Quiroz responded to the January 14, 2022[,] 5:30

16   a.m. radio call for assistance for an unresponsive inmate.  He notified Detective [Lieutenant] Kevin

17   Wright, who took over the incident."  *Id.* ¶ 130.  On January 14, 2022, Decedent died at the age of

18

---

19   [8] A review of the video evidence confirms that Defendant McRoberts did not reach Decedent's cell door at 2:28 a.m.  The footage depicts McRoberts and another individual walking to each cell door on the lower floor of the C-pod.  Both stop short of Decedent's cell door.  At no point are they in a position where they have the ability to look into the cell through the observation window on the door, nor do they seem to call out or make any other attempt to communicate with Decedent.  *See* (Doc. 178-21, Ex. 7 at 2:26:26.250 AM to 2:28:11.057 AM); (Doc. 202, Ex. 47 at same).

23   [9] A review of the video evidence confirms that upon reaching Decedent's cell door, after another individual deposits a meal through Decedent's cell door slot at approximately 3:31:11 a.m., Defendant McRoberts whistles, taps on the cell door, and calls out "food," pausing there for a total of approximately 18 seconds.  *See* (Doc. 178-21, Ex. 7 at 3:29:56.063 AM to 3:31:39.470 AM); (Doc. 202, Ex. 47 at same).  The evidence also confirms that, at approximately 4:21:27 a.m., McRoberts reaches Decedent's cell door and at approximately 4:21:33 a.m., he calls out "Julien."  At approximately 4:21:40 a.m., McRoberts walks away from Decedent's cell door.  There is no visual or auditory indication in the video evidence that Decedent responded to McRoberts.  *See id.* at 4:20:45.367 AM to 4:21:54.697 AM.  In McRoberts' deposition, counsel for Plaintiffs asked whether "[t]hroughout your shift which began on January 13th, 2022, at 1900 hours, up until the time when you found him unresponsive at approximately 0527 hours [], did [Decedent] ever acknowledge your presence?"  McRoberts responded, "I don't remember."  (Doc. 200-5, Ex. 5 at 66:16-21).

27.  *Id.* ¶¶ 3-4.  During the time of his death while in custody of the County of Kern, he was in cell C-216.  *Id.* ¶ 7.

### vi.  *Events After Decedent's Death*

Neither Defendants' nor Plaintiffs' statement of facts address events following Decedent's death.  The following facts are drawn from records created by KCSO in the course of investigating the incident and attached by Plaintiffs to their opposition.

Decedent's time of death, as noted on the report of death worksheet prepared by Deputy Mary Abidayo, is 6:03 a.m., as pronounced by Hall Ambulance Service, who responded to the event.  (Doc. 200-1 at 1).  Deputy Abidayo's report states that Sergeant Newell of KCSO reported the death at 6:12 a.m.  *Id.*  This is supported by the report of KCSO Deputy Brock dated January 24, 2022, and reviewed by Sergeant James Callan Newell.  (Doc. 201-8).

Deputy Brock states in his report that Hall Ambulance Service and Kern County Fire personnel responded to the facility after Lerdo Pre-Trial Master Control contacted the Sheriff's Communication Center at approximately 5:25 a.m. on January 14, 2022, and requested an ambulance for Lerdo Pre-Trial Facility for an inmate found unresponsive.  (Doc. 201-8 at 3).  Deputy Brock wrote that, upon his arrival, he met with Sergeant Newell, Detective Tinoco, and Detective Romo, all of whom then walked to C-pod and contacted Deputy Briggs, Sergeant Quiroz, Defendant McRoberts, and Deputy Parker.  Deputy Robles "was in control of the crime scene log and documented all personnel entering and exiting C-Pod Unit 2."  *Id.* at 3-4.

Deputy Brock includes in his report the following description of the C-pod area of the facility, which is supported by the video evidence (Doc. 202, Ex. 47):

> Detectives entered Unit 2 and began processing the scene with Crime Scene Technicians.  C-Pod Unit 2 is a two-tiered housing unit consisting of 16 cells, eight (8) on the top tier and eight (8) on the bottom tier.  The bottom tier cells have bullpens, and C-216 is one of four cells in bullpen three.
>
> When I entered bullpen three, I noticed [Decedent] was lying on his back in front of his cell (C-216).  [Decedent] had on brown inmate pants and a brown inmate shirt that was cut, exposing his chest.  There were AED pads affixed to [Decedent's] left and right chest areas.  The AED pads were connected to the AED base that was on the floor next to [Decedent].  Additionally, I noticed multiple EKG

> tabs affixed to [Decedent's] chest, which were placed on him by medical personnel.
>
> Coroner Investigator Abidaya completed her examination on [Decedent]. She placed preservation bags on Decedent's left hand at 0756 hours and right hand at 0757 hours. Kern Regional Transport assistants placed [Decedent] into a yellow body bag. Coroner Investigator Abidaya secured the bag with locking tab number 044692. Coroner Investigator Abidaya took possession of [Decedent] and left the scene.

(Doc. 201-8 at 4; capitalization omitted). Deputy Brock continues:

> I completed a search of the cell. I noticed an inmate mattress on the top bunk with an additional pair of brown inmate clothing and bedding rolled up together. The bed was not made. No items were covering the cell door window to obstruct the view of the cell. The cell light was not covered, and the cell appeared to be well lit. There were three unopened sack lunches, and one opened sack lunch outside of the cell. Inside the cell, I observed one unopened sack lunch next to the door. Digital photographs were taken of the cell before I searched it. Refer to the photographs for further details.
>
> I spoke with the inmate in cell C-214, identified as Richard Johnson (booking #2307706). Johnson told me after detentions staff completed a check around 0330 hours, he heard the inmate [Decedent] from cell C-216 yelling. Johnson said he believed [Decedent] was yelling for help. However, Johnson did not know the exact time and wasn't sure why [Decedent] was yelling. I asked Johnson if the sack lunches outside cell C-216 had been there for a while, he said they had not.

*Id.* at 4-5; capitalization omitted.

Deputy Brock's report is cited only once in the parties' statements of facts. Plaintiffs state that Deputy Brock's report establishes that there were four unopened sack meals in Decedent's cell when he died. *See* (Doc. 198 ¶ 521; Doc. 214 ¶ 521). Deputy Brock's report states the following: "There were three unopened sack lunches, and one opened sack lunch outside of the cell. Inside the cell, I observed one unopened sack lunch next to the door." (Doc. 201-8 at 4). The most likely reading of Deputy Brock's report suggests that, at the time of Deputy Brock's inspection, there were, in fact, three unopened and one opened sack lunch outside the cell, and only one unopened sack lunch inside the cell.

///

1

*vii.* ***Evidence Concerning Cause of Death***

2

Plaintiffs dispute the cause of death as recorded in the autopsy report. *See* (Doc. 205 at 10).

3 Plaintiffs assert that, though the autopsy records the cause of death as hypertensive heart disease,

4 the actual cause of death was sepsis. *Id.* (citing Doc. 200-11, Declaration of Kris Sperry ("Sperry

5 Decl.")). Physician Kris Sperry, an expert witness for Plaintiffs, opines that Decedent "died of

6 sepsis … at least one hour before 0527 hours" and that the actual cause was "a cardiac arrest caused

7 by refractory sepsis-mediated hypotension with shock, leading to cardiovascular collapse and

8 death." (Sperry Decl. ¶¶ 3-4). Dr. Sperry opines that it "is not known whether the injury to

9 Decedent's right hand that became infected and led to his death by sepsis was caused at

10 approximately 11:30 p.m. on January 3, 2022, when his hand was caught in the steel cell door, but

11 it could have been." *Id.* ¶ 8.[10] Dr. Sperry opines that Decedent had been "exhibiting symptoms of

12 septic shock for at least 12 hours before 0527 hours," namely confusion, inability to stand on his

13 own, inability to walk, inability to respond coherently, and refusal of food, and that Decedent

14 "could have been saved if, 1-1.5 hours before his death, he had been emergently transported to a

15 hospital" and received care. *Id.* ¶¶ 5-6.

16

Plaintiffs also refer to the opinion of physician Frank Sheridan, an expert witness for

17 Defendants, who opined that Decedent's death was due neither to sepsis nor hypertensive heart

18 disease, but rather, to a "sudden" cardiac event resulting from Decedent's schizophrenia. (Doc.

19 201-3 at 4). Defendants dispute the claim that Decedent died of sepsis but assert that, even if

20 assumed true, Plaintiffs "have no evidence [D]efendants caused the injury, or that [D]efendants

21 cause[d] the sepsis." (Doc. 178 at 30).

22 ///

23

---

24

[10] Defendants object to this fact on the grounds that "Dr. Sperry did not provide a rebuttal report on or before June 19, 2025" and, thus, "any additional testimony from him is late and should be stricken."

25 (Doc. 214 ¶ 506). Defendants filed an amended response to Plaintiffs' statement of facts, noting that Dr. Sperry did timely file a rebuttal report. (Doc. 218 at 1 n.1). During the hearing on the motion, the Court

26 questioned counsel for Defendants regarding the objection. Counsel represented that Defendants had no substantive dispute with the citations to the Sperry Declaration as supporting evidence, but that Dr. Sperry

27 is not a radiologist and, therefore, lacks the expertise to opine on matters involving, for example, x-rays. As discussed *infra*, the Court need not resolve this dispute in connection with Defendants' motion for summary

28 judgment.

1    **II.    Standard of Law**

2       **A. Summary Judgment**

3       Summary judgment is appropriate where there is "no genuine dispute as to any material fact

4    and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Washington*

5    *Mutual Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011).  An issue of fact is genuine only

6    if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a

7    fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v.*

8    *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422,

9    1436 (9th Cir. 1987).

10      On summary judgment, each party's position must be supported by: (1) citing to particular

11   portions of materials in the record, including but not limited to depositions, documents,

12   declarations, or discovery; or (2) showing that the materials cited do not establish the presence or

13   absence of a genuine dispute or that the opposing party cannot produce admissible evidence to

14   support the fact.  *See* Fed. R. Civ. P. 56(c)(1).  The court may consider other materials in the record

15   not cited to by the parties, but it is not required to do so.  *See* Fed. R. Civ. P. 56(c)(3); *Carmen*, 237

16   F.3d at 1031.  Furthermore, "[a]t summary judgment, a party does not necessarily have to produce

17   evidence in a form that would be admissible at trial."  *Nevada Dep't of Corr v. Greene*, 648 F.3d

18   1014, 1019 (9th Cir. 2011) (citations and internal quotations omitted).  The focus is on the

19   admissibility of the evidence's contents rather than its form.  *Fonseca v. Sysco Food Servs. of*

20   *Arizona, Inc.*, 374 F.3d 840, 846 (9th Cir. 2004).

21      "The moving party initially bears the burden of proving the absence of a genuine issue of

22   material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex*

23   *Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  To meet its burden, "the moving party must either

24   produce evidence negating an essential element of the nonmoving party's claim or defense or show

25   that the nonmoving party does not have enough evidence of an essential element to carry its ultimate

26   burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d

27   1099, 1102 (9th Cir. 2000).  If the moving party meets this initial burden, the burden then shifts to

28   the non-moving party "to designate specific facts demonstrating the existence of genuine issues for

1     trial." *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 387 (citing *Celotex Corp.,* 477 U.S. at 323).  The

2     non-moving party must "show more than the mere existence of a scintilla of evidence." *Id.* (citing

3     *Anderson,* 477 U.S. at 252).  However, the non-moving party is not required to establish a material

4     issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to

5     require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec.*

6     *Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation and citation

7     omitted).

8           The court must apply standards consistent with Rule 56 to determine whether the moving

9     party has demonstrated the absence of any genuine issue of material fact and that judgment is

10    appropriate as a matter of law.  *See Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).

11    "[A] court ruling on a motion for summary judgment may not engage in credibility determinations

12    or the weighing of evidence." *Manley v. Rowley,* 847 F.3d 705, 711 (9th Cir. 2017) (citation

13    omitted).  The evidence must be viewed "in the light most favorable to the nonmoving party" and

14    "all justifiable inferences" must be drawn in favor of the nonmoving party.  *Orr v. Bank of Am., NT*

15    *& SA*, 285 F.3d 764, 772 (9th Cir. 2002); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir.

16    2000).

17          Finally, "[t]he mere existence of video footage of the incident does not foreclose a genuine

18    factual dispute as to the reasonable inferences that can be drawn from that footage." *Vos v. City of*

19    *Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018)  "The record is viewed in the light most

20    favorable to the nonmovants … so long as their version of the facts is not blatantly contradicted by

21    the video evidence[.]" *Id.* (citation omitted); *see Hughes v. Rodriguez*, 31 F.4th 1211, 1218 (9th

22    Cir. 2022) ("[F]or purposes of ruling on a motion for summary judgment, a district court may

23    properly view the facts in the light depicted by bodycam footage and its accompanying audio, to

24    the extent the footage and audio *blatantly* contradict testimonial evidence.") (emphasis in original).

25        **B.  Qualified Immunity**

26          The doctrine of qualified immunity shields government officials from civil damages unless

27    their conduct violates "clearly established statutory or constitutional rights of which a reasonable

28    person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In evaluating a claim

1    of qualified immunity, a court must determine whether, (1) taken in the light most favorable to the

2    plaintiff, the defendant's conduct violated a constitutional right, and (2) if so, whether the right was

3    clearly established at the time of the violation.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  In its

4    qualified immunity analysis, a court may use either prong as its starting point and, thus, exercise

5    its "discretion to resolve a case only on the second ground when no clearly established law shows

6    that the officers' conduct was unconstitutional."  *O'Doan v. Sanford*, 991 F.3d 1027, 1036 (9th Cir.

7    2021).

8         Under the first prong of the analysis, "whether a constitutional right was violated … is a

9    question of fact."  *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1085 (9th Cir. 2009);

10   *see Ballentine v. Tucker*, 28 F.4th 54, 61 (9th Cir. 2022) (explaining that under the first prong of

11   the qualified immunity analysis, the court considers whether the facts show a violation of a

12   constitutional right).  In contrast, "the 'clearly established' inquiry is a question of law that only a

13   judge can decide."  *Morales v. Fry*, 873 F.3d 817, 821 (9th Cir. 2017); *see Reese v. Cnty. of*

14   *Sacramento*, 888 F.3d 1030, 1037 (9th Cir. 2018).

15        "To be clearly established, a legal principle must have a sufficiently clear foundation in

16   then-existing precedent," meaning "it is dictated by 'controlling authority' or 'a robust consensus

17   of cases of persuasive authority.'"  *D.C. v. Wesby*, 583 U.S. 48, 63 (2018) (citing *Ashcroft v. al-*

18   *Kidd*, 563 U.S. 731, 741-42 (2011)).  Stated differently, "[a] right is clearly established when it is

19   'sufficiently clear that every reasonable official would have understood that what he is doing

20   violates that right.'"  *Rosenbaum v. City of San Jose*, 107 F.4th 919, 924 (9th Cir. 2024) (quoting

21   *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021)) (citation omitted).  A section 1983 plaintiff

22   bears the burden of proof that the right allegedly violated was clearly established at the time of the

23   alleged misconduct.  *Hopson v. Alexander*, 71 F.4th 692, 708 (9th Cir. 2023) ("There is no

24   analogous burden on § 1983 defendants to find factually on-point cases clearly establishing the

25   lawfulness of an officer's actions.  Nor must § 1983 defendants come forward with precedent

26   showing that the unlawfulness of their conduct was not clearly established."); *Romero v. Kitsap*

27   *Cnty.*, 931 F.2d 624, 627 (9th Cir. 1991).

28        "For a constitutional right to be clearly established, a court must define the right at issue

17

1    with specificity and not … at a high level of generality." *Gordon v. Cnty. of Orange*, 6 F.4th 961,

2    968 (9th Cir. 2021) (hereinafter, "*Gordon II*"; internal quotations and citation omitted).  When

3    identifying the right that was allegedly violated, a court must define the right more narrowly than

4    the constitutional provision guaranteeing the right, but more broadly than all of the factual

5    circumstances surrounding the alleged violation.  *See Watkins v. City of Oakland, Cal*., 145 F.3d

6    1087, 1092–93 (9th Cir. 1998).  "The Supreme Court has 'repeatedly ... stressed the importance of

7    resolving immunity questions at the earliest possible stage of litigation." *Dunn v. Castro*, 621 F.3d

8    1196, 1199 (9th Cir. 2010) (quoting *Hunter v. Bryant,* 502 U.S. 224, 227 (1991)).

9    **III.    Discussion**

10   In the operative second amended complaint, Plaintiffs asserts the following claims under 42

11   U.S.C. § 1983: (1) deliberate indifference to serious medical needs (against all Defendants); (2)

12   deprivation of the liberty interest in the companionship of children and parents (against all

13   Defendants); and (3) municipal liability and supervisory liability (against County of Kern, KCSO,

14   Jauch, Levig, and Balasis).  *See* (Doc. 125).  Under state law, Plaintiffs assert the following claims:

15   (4) California Civil Code § 52.1 (the "Bane Act"; against County of Kern, KCSO, Jauch, Levig,

16   Balasis, McRoberts, De La Torre, Sanchez, Rice, Artiga, Covarrubias, Rivera, Sosa); (5) negli-

17   gence – survival action (against all Defendants); and (6) wrongful death under California Code of

18   Civil Procedure § 377.60 (against all Defendants).  *See id.*

19   As a preliminary matter, of the remaining Defendants, Deputy Huckabee, Deputy Martinez,

20   and Deputy Navarro are mentioned neither in the operative second amended complaint ("SAC")

21   nor in Plaintiffs' opposition to Defendants' motion.  *See* (Doc. 125; Doc. 205).  As such, summary

22   judgment will be granted as to Defendants Huckabee, Martinez, and Navarro.  Defendant Sanchez

23   is mentioned in the SAC but not in Plaintiffs' opposition; he is mentioned only in Plaintiffs'

24   accompanying statement of facts in support of the municipal liability claims.  *See* (Doc. 198).  As

25   Plaintiffs do not provide any argument for facts in dispute regarding Defendant Sanchez

26   individually concerning the events at issue, summary judgment will be granted as to Defendant

27   Sanchez.  Similarly, Defendant Jauch is mentioned neither in Plaintiffs' opposition nor statement

28   of facts and, thus, summary judgment will be granted as to Defendant Jauch.  *See Vasquez v. Cnty.*

*of Santa Clara*, No. 5:16-CV-05436-EJD, 2017 WL 6513647, at *7 (N.D. Cal. Dec. 20, 2017), *aff'd*, 803 F. App'x 100 (9th Cir. 2020) ("In addition to the individual Defendants discussed above, six other individual Defendants have been named in this case [and] Plaintiffs did not mention these Defendants in their opposition brief.  Summary judgment is therefore warranted in favor of these six Defendants.") (citing Fed. R. Civ. P. 56(e)).

Turning first to the claims brought pursuant to federal law, the Civil Rights Act provides:

> Every person who, under color of [state law] ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution ... shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...

42 U.S.C. § 1983.  To prevail on a claim under section 1983, a plaintiff must prove that the conduct complained of was committed by a person acting under color of state law, and that this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or the laws of the United States.  *Parratt v. Taylor*, 451 U.S. 527, 535 (1981); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–95 (1978).  This requires the plaintiff to demonstrate that each defendant personally participated in the deprivation of his rights.  *Ewing v. City of Stockton*, 588 F.3d 1218, 1235 (9th Cir. 2009); *Preschooler II v. Clark County Sch. Bd. of Trs.*, 479 F.3d 1175, 1183 (9th Cir. 2007).

**A.    The Fourteenth Amendment Governs the Claims at Issue**

### *i.  Governing Law*

The Fourteenth Amendment protects the rights of pretrial detainees.  *Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *see Sandoval*, 985 F.3d at 667 (noting that pretrial detainees' "rights arise under the Fourteenth Amendment's Due Process Clause").  Relevant here, the elements of a pretrial detainee's Fourteenth Amendment failure-to-protect claim against an individual defendant are:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (4) by not taking such measures, the defendant caused the plaintiff's injuries. With respect to the third element, the

1
2

> defendant's conduct must be objectively unreasonable, a test that
> will necessarily turn[] on the facts and circumstances of each
> particular case.

3    *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (alteration in original; footnote,

4    citation, and internal quotation marks omitted); *see Gordon v. Cnty. of Orange*, 888 F.3d 1118,

5    1125 (9th Cir. 2018) (hereinafter, "*Gordon I*").

6    The Supreme Court has explained that there is "no significant distinction between claims

7    alleging inadequate medical care and those alleging inadequate 'conditions of confinement.'

8    Indeed, the medical care a prisoner receives is just as much a 'condition' of his confinement as ...

9    the protection he is afforded against other inmates." *Wilson v. Seiter*, 501 U.S. 294, 303 (1991);

10   *see Gordon I*, 888 F.3d at 1124 ("we have long analyzed claims that government officials failed to

11   address pretrial detainees' medical needs using the same standard as cases alleging that officials

12   failed to protect pretrial detainees in some other way").

13   Thus, a plaintiff in pretrial detention asserting a claim for failure to protect or inadequate

14   medical care under the Fourteenth Amendment must establish the same four factors as noted above.

15   *Gordon I*, 888 F.3d at 1125; *Castro*, 833 F.3d at 1071.  In contrast to the knowing and purposeful

16   state of mind in the first element, the remaining elements are measured against an objective

17   standard.  *See Castro*, 833 F.3d at 1070-71.  The third element must be viewed on each case's

18   particular facts and circumstances, and the plaintiff must prove the defendant acted with "more than

19   negligence but less than subjective intent – something akin to reckless disregard." *Sandoval*, 985

20   F.3d at 669 (quoting *Castro*, 833 F.3d at 1071).

21                                    *ii.  Analysis*

22   Here, Plaintiff was detained after his arrest, pending a hearing regarding violation of

23   probation and on new charges.  He had been arrested but not yet convicted of any crimes, nor had

24   he been found to have violated probation.  *See* (Doc. 198 ¶ 60; Doc. 202-16).  Thus, Decedent was

25   a pre-trial detainee and, thus, Plaintiffs' claims of deliberate indifference arise pursuant to the

26   Fourteenth Amendment.  *See Cole v. McAllister*, 548 F. Supp. 3d 985, 992 (D. Idaho 2021) (finding

27   Fourteenth Amendment applied where detainee had pending probation violation hearing and trial

28   on a new charge).

1    Plaintiffs identify three separate events that implicate Defendants' conduct underlying

2    Plaintiffs claims for violation of constitutional rights under section 1983: the January 3, 2022, cell

3    extraction of Decedent (hereinafter, the "extraction incident"); the January 11, 2022, court transport

4    of Decedent (hereinafter, the "transport incident"); and the January 13-14, 2022, cell checks

5    (hereinafter, the "cell checks"). *See* (Doc. 205).  The Court will address each incident in turn.

6    **B.    Extraction Incident**

7    ***i.  Disputes Regarding Defendants' Knowledge of Injury***

8    Plaintiffs dispute certain assertions by the individual Defendants involved in the extraction

9    incident, namely Rice, Artiga, Balasis, and Covarrubias, concerning their lack of knowledge of any

10   injury to Decedent's hand caused by the opening of his cell door.  Rice attests he "did not observe

11   an actual injury to [Decedent's] hand" and Artiga, Balasis, and Covarrubias attest they were "not

12   aware of any injury to [Decedent's] hand."  (Doc. 198 ¶¶ 139, 142, 141, 144).  Plaintiffs do not

13   dispute Rice's statement and, thus, the Court will accept said fact as true as to Rice for purposes of

14   ruling on the motion.  However, Plaintiffs dispute these representations as to Artiga, Balasis, and

15   Covarrubias on the grounds that they were present when Decedent was "yelling out in pain after

16   his hand was caught in the steel gate" and that "there is no evidence" that any of said Defendants

17   "inspected [Decedent's] hand or even looked at his hand."[11]  *Id.*

18   Artiga, Balasis, and Covarubbias' attestations that they were "not aware of any injury to

19   [Decedent's] hand" are based on their personal knowledge of events at which they were present

20   and involved.  (Doc. 198 ¶¶ 139, 142, 141, 144).  Each of said Defendants state in their declarations

21   that their attestations are made upon their personal knowledge and that they could testify truthfully

22   thereto.  Their declarations are signed under penalty of perjury.  *See* (Docs. 178-3, 178-5, 178-19).

23   Further, though the video evidence of the extraction incident does show Decedent yelling after the

24   cell gate opens while his hand is clutching the gate's bars, the evidence also shows Decedent yelling

25

26   ───────────────

     [11] Plaintiffs alter the language somewhat when disputing Balasis' representation, stating that Balasis
27   was present when Decedent "was screaming in pain and stating his hand hurt after it was caught in the cell
     door in [c]ell B1-7; there is no evidence in the video that Quiroz or any other deputy inspected [Decedent's]
28   hand or even looked at his hand."  (Doc. 198 ¶ 144A).  It is unclear why Plaintiffs refer to Quiroz, who is
     no longer a defendant in this action.  The Court will presume that Plaintiffs intended to refer to Balasis
     instead.

prior to the gate opening as Defendants walk up to the cell and after he is removed from the cell. The video footage accompanying Defendants' motion does not evidence any obvious injury to Decedent's hand. *See* (Doc. 178-1, Ex. 1). It is not necessary for Artiga, Balasis, and Covarrubias to have inspected Decedent's hand for them to be able to represent their personal knowledge as to whether they knew of any injury to Decedent's hand at that time. Finally, there is no evidence that Decedent claimed to be injured or requested medical attention.

Taking as true that Defendants heard Decedent yell in pain after his hand was momentarily caught in the door of his cell as it opened, this establishes at most that Defendants were aware he experienced pain, which is not inconsistent with Defendants' unawareness of any resulting injury, particularly given the absence of any contemporaneous video or photographic evidence suggesting the existence of a physical wound. Accordingly, the Court finds that Plaintiffs' objections to Artiga, Balasis, and Covarrubias' professed lack of awareness of any injury to Decedent's hand during the extraction incident are not supported by evidence and, thus, do not create a genuine dispute of fact on this issue.

### ii.  Analysis – Fourteenth Amendment

To prevail on their Fourteenth Amendment claim, Plaintiffs must show that (1) the individual Defendants made an intentional decision regarding denial of care, (2) the denial of care put Decedent at substantial risk of suffering serious harm, (3) the individual Defendants did not take reasonable available measures to abate or otherwise reduce the risk of that harm – even though a reasonable official under the circumstances would have understood the high degree of risk involved – making the consequences of their conduct obvious, and (4) by not taking such measures, individual Defendants caused Decedent's death. *Castro*, 833 F.3d at 1071. This requires a showing of "more than negligence but less than subjective intent – something akin to reckless disregard." *Sandoval*, 985 F.3d at 669. "The 'reckless disregard' standard is a formidable one. Neither 'mere lack of due care,' nor 'an inadvertent failure to provide adequate medical care,' nor even '[m]edical malpractice,' without more, is sufficient to meet this standard." *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 636 (9th Cir. 2021) (internal and concluding citations omitted). Accord *Gordon I*, 888 F.3d at 1125 (citations and quotations omitted).

The relevant facts are that on January 3, 2022, Decedent threw a dinner tray out of his cell when a deputy was conducting checks. During this incident, Decedent "repeatedly yelled out to deputies" challenging them and telling them to "hit him in the head" and to "stop poisoning his food," and that he "was going to turn off the cameras." After this incident, on January 4, 2022, Decedent was transferred to a new cell and "a mental health referral was made" by Defendant Rice. Defendants Artiga, Covarrubias, Rice, and Balasis removed Decedent from his cell, handcuffed him, and immediately walked him to a new cell. During the transfer, Decedent's hand was "momentarily caught" in the cell door. While he was being escorted to his new cell, Decedent yelled out, among other things, "it hurts!", "ah!", and "please help!" Decedent was not bleeding after the cell movement and was not referred by Defendants for medical care. The video footage of the extraction incident is consistent with the above account. *See* (Doc. 178-1, Ex. 1).

Based on these undisputed facts and making all inferences in favor of Plaintiffs, the lack of referral of Decedent for mental health treatment by Defendants Artiga, Balasis, and Covarrubias was not objectively unreasonable given that Defendant Rice did refer Decedent for mental health care. Additionally, viewing the facts in the light most favorable to Plaintiffs, there is no indication that reasonable officers under the circumstances would have understood the high degree of risk involved in what the Court infers is the intentional act at issue – not referring Decedent for medical treatment – making the consequences of their conduct obvious. A prison official may be liable for failure to provide necessary medical treatment only where the officer is "aware that an inmate is suffering from a serious acute medical condition." *Sandoval*, 985 F.3d at 680. Decedent's actions, though clearly erratic and suggestive of healthcare concerns, were not obviously tied to his physical health. Assuming, as the Court must for purposes of ruling on this motion, that sepsis may have been the cause of Decedent's death, there is no indication that these events would have alerted a reasonable officer to a high degree of risk arising from a physical injury, infection, or impairment.

Defendants Artiga, Balasis, Covarrubias declared they were not aware of any injury to Decedent's hand and Defendant Rice declared he did not observe an actual injury to Decedent's hand. These statements are supported by the video surveillance footage. *See* (Doc. 178-1, Ex. 1). It is undisputed that Decedent was not bleeding after the cell movement. Neither Decedent's hand

1    nor finger, nor any other part of his body, appeared to be misshapen, injured, or otherwise abnormal

2    in any way.  The footage shows that the movement of the cell door was at a low rate of speed when

3    it impacted Decedent's finger and did not crush Decedent's finger; the door stopped immediately

4    after making contact with Decedent's finger.  These events were observable to the individual

5    Defendants.  Additionally, upon intake, Nurse Godoy "conducted an intake medical screening of

6    [D]ecedent" that same day, noting "no physical problems or injuries that required medical

7    attention."  (Doc. 198 ¶¶ 29-30).  Thus, the intake also did not put Defendants Artiga, Balasis,

8    Covarrubias, and Rice on notice regarding any physical injuries that may have been considered in

9    light of the extraction incident.

10        In sum, no reasonable juror could conclude from the evidence of record that Defendants

11   Artiga, Balasis, Covarrubias, and Rice were objectively unreasonable in failing to perceive a high

12   degree of risk and referring Decedent for evaluation of his physical health, including of his finger

13   and as to risk of infection or sepsis, after the extraction incident.  *See, e.g., Jurgens v. Columbia

14   Cnty.*, No. 3:22-CV-00300-IM, 2025 WL 563769, at *4 (D. Or. Feb. 20, 2025) (finding "no

15   evidence from which a jury could conclude that a reasonable officer in [defendant's] position would

16   have understood that [decedent] faced a substantial risk of serious harm," where pretrial detainee

17   died of acute cardiac arrhythmia or dysrhythmia after being found unresponsive in her cell and no

18   evidence indicated that a reasonable officer in defendant's position would have known about any

19   of decedent's medical problems); *cf. Hill v. Men's Cent. Jail*, No. CV 16-7045 PA (MRW), 2018

20   WL 1448674, at *2 (C.D. Cal. Jan. 5, 2018), *report and recommendation adopted*, 2018 WL

21   1441139 (Mar. 21, 2018) (decision predating *Gordon I* and finding under Eighth Amendment, after

22   plaintiff's elbow was caught between bars of opening cell door and he complained to defendant

23   deputy, no jury could find defendant deputy deliberately indifferent where no proof established he

24   was aware of any urgent need for care and no evidence indicated plaintiff's injury was visible).

25                        *iii.  Analysis – Qualified Immunity*

26        As the Court has concluded that no reasonable juror could find that Defendants Artiga,

27   Balasis, Covarrubias, and Rice violated Decedent's constitutional rights in connection with the cell

28   extraction incident, the Court need not reach the issue of qualified immunity.  Nonetheless, in the

1    alternative, the Court finds that, even if said Defendants violated Decedent's constitutional rights,

2    they would be entitled to qualified immunity.

3        Here, Plaintiffs bear the burden of proof to show that the rights allegedly violated were

4    clearly established at the time of the alleged misconduct. *See Hopson*, 71 F.4th at 708. However,

5    Plaintiffs cite to no specific authority in support of their assertion that said Defendants are not

6    entitled to qualified immunity; Plaintiffs only identify the general proposition that "pretrial

7    detainees have the right to medical care." *See* (Doc. 205) (citing *Taylor v. Riojas*, 592 U.S. 7

8    (2020)).

9        It is plain that pretrial detainees have a constitutional right to adequate medical care while

10   in custody. *Russell v. Lumitap*, 31 F.4th 729, 738 (9th Cir. 2022); *Sandoval*, 985 F.3d at 667.

11   However, taking the facts before the Court in the light most favorable to Plaintiffs, none of the

12   authorities is sufficiently analogous to the situation confronting the aforementioned Defendants.

13   "Existing Ninth Circuit cases on medical care for pretrial detainees broadly fall into three

14   categories: (1) cases where prison officials failed to adequately screen pretrial detainees, (2) cases

15   where jail staff failed to provide 'life-saving measures' to inmates in 'obvious need' of aid, and (3)

16   cases where the officers know of a serious condition but 'deny, delay, or intentionally interfere'

17   with needed treatment." *Jurgens*, 2025 WL 563769, at *7 (collecting cases) (citing, *inter alia*,

18   *Gordon II*, 6 F.4th at 971; *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1082 (9th Cir.

19   2013); *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002)); *see Sandoval*, 985 F.3d at 679–80

20   ("The rule reflected in these decisions is clear: a prison official who is aware that an inmate is

21   suffering from a serious acute medical condition violates the Constitution when he stands idly by

22   rather than responding with reasonable diligence to treat the condition.").

23       No facts or evidence before the Court suggest that Defendants Artiga, Balasis, Covarrubbias,

24   and Rice were responsible for screening Decedent and, in any event, said screening was completed

25   by Nurse Godoy. (Doc. 198 ¶¶ 29-30). Additionally, it cannot be said that Decedent obviously

26   required "life-saving measures" at the point in time at which said Defendants interacted with

27   Decedent. Further, Defendant Rice referred Decedent for mental health treatment. No facts

28   indicate said Defendants were responsible for providing any such treatment. The record sets forth

1    that Nicholas Torrez, an individual no longer party to this action, was the care provider. *Id.* ¶¶ 131-

2    133. Neither do any facts suggest that said Defendants were aware of needed treatment and denied,

3    delayed, or interfered with any such treatment.

4          It follows that Defendants Artiga, Balasis, Covarrubias, and Rice were not on notice that

5    their conduct could violate the Constitution and are, therefore, entitled to qualified immunity. *See*

6    *Jurgens*, 2025 WL 563769, at *7 ("This is not the sort of reckless disregard that the Ninth Circuit

7    has previously held to violate clearly established law. Neither [defendants] denied or interfered

8    with [decedent's] care in a way similar to the officials in *Sandoval* and the cases it cites.") (citation

9    omitted).

10          **C.     Transport Incident**

11                  ***i.  Analysis – Fourteenth Amendment***

12          The transport incident involved Defendants De La Torre, Rivera, and Sosa. The

13    circumstances up to and concerning the transport incident present a similar context as the extraction

14    incident. That is, Decedent engaged in behavior indicative to a reasonable official of serious mental

15    health concerns but did not express behavior that would put a reasonable official on notice regarding

16    serious risks as to physical injuries, infection, or sepsis.

17          The relevant facts establish that Decedent was largely incomprehensible during his January

18    5, 2022, court proceeding, where his counsel declared a doubt and the court suspended the

19    proceedings pursuant to California Penal Code § 1368, appointed Dr. Longwith to evaluate

20    Decedent, and continued the hearing. *See* (Doc. 202-16). On January 6, 2022, Decedent refused

21    to be transported to court and, on January 10, 2022, Dr. Longwith attempted to conduct a medical

22    evaluation of Decedent but Decedent refused to exit his cell. (Doc. 198 ¶ 59; Doc. 214 ¶ 516).

23          It is undisputed, and the video evidence corroborates, that Decedent was ambulating of his

24    own power the morning of January 11, 2022, prior to the hearing, for over 40 minutes while in a

25    holding cell. While being transported to the holding cell, the video evidence shows Decedent being

26    escorted by officers, with one officer holding onto each of Decedent's arms. However, it is clear

27    that Decedent is not being carried, dragged, or otherwise significantly supported and appears to be

28    substantially supporting his own weight, both when being taken to the holding cell and when being

taken to the transport vehicle. *See* (Doc. 202, Ex. 48). During the arraignment, Decedent's attorney appeared with Decedent in court and "did not observe that [Decedent] was ill" nor recalled "seeing [Decedent] with bloody hands." (Doc. 198 ¶¶ 68-70). The attorney provided a signed declaration that accompanied Defendants' motion, setting forth his employment as a Deputy Public Defender for the Kern County Public Defenders' Office. The attorney attests that he was appointed to represent Decedent, that he appeared with Decedent at the January 11, 2022, arraignment hearing, and that he "had a doubt as to [Decedent's] mental competence," did not "recall [Decedent] being physically ill," and did not "recall seeing [Decedent] with bloody hands." (Doc. 178-12 ¶¶ 1-6).

Upon return of the transport bus to the facility, Defendant De La Torre was waiting outside the transport van with other deputies for several minutes while Defendant Rivera was obtaining a wheelchair. Both Defendants attended to helping Decedent into the wheelchair and he was transported to his cell.

As noted *supra*, a failure to provide medical care to an inmate implicates liability under the Fourteenth Amendment only where a reasonable correctional officer under the same circumstances would understand the inmate faced a "substantial risk of serious harm." *See Sandoval*, 985 F.3d at 679 (finding a reasonable nurse who was told by a correctional officer that inmate exhibited physical signs of distress, that "there was still something going on" and that the inmate needed to be looked at "more thoroughly" would understand the inmate faced a substantial risk of serious harm). A "mere due lack of care" does not establish a constitutional violation. *Gordon I*, 888 F.3d at 1125 (citation omitted). A plaintiff must "prove more than negligence" and "something akin to reckless disregard." *Sandoval*, 985 F.3d at 669.

Here, Decedent was ambulating under his own power for considerable time during the morning prior to the hearing, and the video footage does not evidence any indications of serious medical concerns. Though the record does not appear to suggest that Defendants De La Torre, Rivera, and Sosa were able to observe, or had knowledge of, Decedent's presentation at the hearing, Decedent's counsel declares that Decedent did not seem physically ill. As noted *supra* regarding the extraction incident, Decedent showed signs of mental health issues, as his counsel declared a doubt during the hearing. However, such signs are not of the type that a reasonable correctional

officer under similar circumstances would be on notice that Decedent was at a high degree of risk of a serious medical condition warranting referral for evaluation of his physical health.  In the light most favorable to Plaintiffs, the record evidence of the transport incident reflects Decedent being escorted and assisted out of the transport vehicle upon return to the facility, and placed in a wheelchair to be taken back to his cell, but not Decedent's display of any indicators of a serious medical condition observable by Defendants De La Torre, Rivera, and Sosa.

At best, a failure to refer Decedent to medical care in such circumstances may support a claim of negligence.  However, presentation of evidence for such "mere due lack of care" does not reach the standard, "something akin to reckless disregard," that would permit a jury to find in favor of Plaintiffs.

### ii.  Analysis – Qualified Immunity

Defendants De La Torre, Rivera, and Sosa are entitled to qualified immunity for substantially similar reasons as the Defendants involved in the extraction incident.  As noted *supra*, taking the facts before the Court in the light most favorable to Plaintiffs, the authority identified by Plaintiffs is not sufficiently analogous to the situation confronting the aforementioned Defendants. *See Jurgens*, 2025 WL 563769, at *7 (collecting cases); *Sandoval*, 985 F.3d at 679–80.

No facts or evidence before the Court suggest that Defendants De La Torre, Rivera, and Sosa were responsible for screening Decedent.  Additionally, it cannot be said that Decedent obviously required "life-saving measures" at the point in time at which said Defendants interacted with Decedent.  Further, it cannot be said that, considering the totality of the circumstances, said Defendants knew of any serious condition and denied, delayed, or interfered with treatment.

Absent clearly established precedent, it follows that Defendants De La Torre, Rivera, and Sosa were not on notice that their conduct could violate the Constitution and, therefore, are entitled to qualified immunity.  *See Jurgens*, 2025 WL 563769, at *7 ("This is not the sort of reckless disregard that the Ninth Circuit has previously held to violate clearly established law.") (citation omitted).

///

///

D.    **Cell Checks**

*i.    Analysis – Qualified Immunity*

The cell checks involved Defendants De La Torre and McRoberts.  The Court will begin by addressing the second prong of the qualified immunity analysis (whether Defendants' conduct here violated Decedent's constitutional rights) because it was clearly established at the time of Decedent's passing that pretrial detainees have a constitutional right to adequate safety checks of their cells.  *See Gordon II*, 6 F.4th at 973 ("pre-trial detainees do have a right to direct-view safety checks sufficient to determine whether their presentation indicates the need for medical treatment."); *Schmitz v. Asman*, No. 2:20-CV-00195-JAM-CKD PS, 2021 WL 5414287, at *4 (E.D. Cal. Nov. 19, 2021), *report and recommendation adopted*, 2021 WL 6052192 (Dec. 21, 2021).

It follows that the right of pre-trial detainees regarding direct-view safety checks was clearly established law at the time of the events at issue and any violations thereof were "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *See Rosenbaum*, 107 F.4th at 924 (quotation and citation omitted).  It is undisputed that Defendant De La Torre and McRoberts were tasked with conducting cell checks in the hours leading up to Decedent's death on January 13 and 14, 2022.  (Doc. 198 ¶¶ 74, 92-93).  Thus, De La Torre and McRoberts enjoy qualified immunity only if the facts, taken in the light most favorable to Plaintiffs, fail to show a violation of the Fourteenth Amendment.  *Ballentine*, 28 F.4th at 61; *Tortu,* 556 F.3d at 1085.

*ii.    Analysis – Fourteenth Amendment*

a.    Defendant McRoberts

KCSO conducted an internal affairs investigation concerning Defendant McRoberts' actions on January 13 and 14, 2022.  *See* (Doc. 224).  An interoffice memorandum regarding the incident was prepared by Sergeant J. Weigand.  *Id.* at 15-16.  Lieutenant A. Garcia prepared a memorandum agreeing with Sergeant Weigand's conclusions.  *Id.* at 13-14.  Sergeant Weigand concluded that Defendant McRoberts was, under KCSO Detentions Bureau Policies and Procedures ("DBPPM") C-450, late for four physical checks regarding cell C-216 on the night of Decedent's death.  DBPPM C-450 requires a "direct visual safety check of inmates housed in pods,

dorms or barracks" once every 60 minutes.  (Doc. 201-1 at 1).  A safety check is defined as "[e]ntry into a housing unit by a deputy during which the deputy makes a direct visual observation of the housing unit and all inmates within the housing unit."  The policy provides that the intent of such a check is to "[a]ccount for the presence of the inmate(s), identify if anything appears out of order and look for signs of observable distress or trauma.  This includes looking for indications that the inmate may be ill, injured, involved in an altercation, have attempted suicide or otherwise be in need of assistance."  *Id.*  Safety checks are to be logged when they begin, or prior to entering the unit, and a reason must be provided in the logbook for any missed check and the shift supervisor notified.  *Id.* at 2.

In this case, a cell check is "late" when the immediately preceding cell check occurred more than 60 minutes prior.  For example, the KCSO report reflects that Defendant McRoberts recorded the start of a check in the logbook at 10:22 p.m. on January 13, 2022.  By the time he reached Decedent's cell C-216, the time was 10:26 p.m.  The next check by Defendant McRoberts was marked in the logbook as beginning at 11:22 p.m.  Defendant McRoberts reached Decedent's cell at 11:30 p.m., as documented in the KCSO report and confirmed by the video footage.  (Doc. 224 at 15; *see* Doc. 202, Ex. 47).  Thus, more than 60 minutes passed between the 10:26 p.m. check of Decedent's cell and the 11:30 p.m. check of Decedent's cell; the amount over 60 minutes is four minutes, meaning Defendant McRoberts was four minutes late when he conducted the 11:30 p.m. check.

Defendant McRoberts was late checking Decedent's cell on four occasions that night.  The first was the above 11:30 p.m. check; next, he was one minute late at his 1:28 a.m. check; then, he was two minutes late at his 3:30 a.m. check; and he was four minutes late at his 5:25 a.m. check.  (Doc. 224 at 15).  Further, it is undisputed that Defendant McRoberts missed entirely the check of Decedent's cell on his round beginning at 2:17 a.m. as recorded in the KCSO report, which should have taken place by 2:28 a.m.  *Id.*; *see* (Doc. 198 ¶ 83; Doc. 178-21, Ex. 7 at 2:26:26.250 AM to 2:28:11.057 AM).  As a result of the missed check and the subsequent late check, Defendant McRoberts did not conduct a safety check of Decedent for a period of two hours and two minutes.

Further, and as discussed *infra*, the Court has conducted a review of the cell checks cited

by Plaintiffs in their statement of facts.  *See* (Doc. 214 at 7-14).  The video footage lodged as exhibits to the parties' briefing reveals a total of three missed safety checks by Defendant McRoberts (one safety check per day over a three-day period): on January 12, 2022, at 8:31:05 p.m., McRoberts does not reach Decedent's cell, as well as two other cells; on January 13, 2022, at 2:26:05 p.m., McRoberts does not reach Decedent's cell, as well as three other cells; and the 2:28:19 a.m. check on January 14, 2022, where McRoberts did not reach Decedent's cell.  From the evening of January 11, 2022, to the early morning of January 14, 2022, McRoberts was late to a total of approximately six checks on the lower tier of the unit that housed Decedent (including the four late checks noted prior), and late for approximately six checks on the top tier of the unit.  (Doc. 202, Exs. 45, 46, 47).

During his deposition, Defendant McRoberts testified that he knew Decedent suffered from mental illness due to their interaction in a prior program.  (Doc. 200-5 at 5, 16:19-17:6).  It is undisputed that C-pod, where Decedent was housed, "is a unit that houses many inmates with psychiatric issues" and that "it is not abnormal for an inmate to fall asleep on the floor in various areas of their cell … Inmates in administrative segregation are known to have irregular sleeping patterns, sometimes sleeping more or less than the average person." (Doc. 198 ¶ 80-81).  Nicholas Torrez did not place Decedent on suicide watch and the record does not suggest Decedent was on suicide watch at the time of his death.  *Id.* ¶ 136.

Having considered the record evidence in the light most favorable to Plaintiffs, including the facts of other officers' interactions with Decedent during the cell extraction and transport incidents, it cannot be said that Defendant McRoberts was aware or reasonably should have been aware of any condition resulting in a heightened risk of serious harm to Decedent, either from mental health conditions, sepsis, or any other condition.  Though Defendant McRoberts had prior knowledge of Decedent suffering from mental illness, as well as his being housed in C-pod indicating as such, nothing in the record suggests that Decedent was on suicide watch or was subject to any other protocol that would make Defendant McRoberts aware of a heightened risk.  And as set forth above, other officers' conduct during the cell extraction and transport incidents does not implicate a Fourteenth Amendment violation.  Nor can it be said that a reasonable correctional

1    officer under similar circumstances would have appreciated that a single missed cell check and

2    several cell checks conducted a few minutes late would create a high degree of risk of serious harm

3    to Decedent.

4        In support of their theory of McRoberts' liability, Plaintiffs proffer the expert opinions of

5    Dr. Kris Sperry, who is a physician and expert in the field of pathology.  (Doc. 200-11 at 1 ¶ 1).

6    Dr. Sperry offers as his ultimate opinion that Decedent died due to a cardiac event triggered by

7    sepsis and that an injury to Decedent's hand caused during the cell extraction incident  that became

8    infected "could have" caused his death by sepsis.  *Id.* at 1-2 ¶¶ 3-4, 8.  Dr. Sperry also opines that

9    Decedent's right hand was "obviously swollen and to a reasonable medical certainty was swollen

10   for at least [two] days before his death," and that "this swelling was severe enough that it would

11   have been obvious to *anyone conducting a proper welfare check* of [Decedent] within the last 12

12   hours of [Decedent's] life."  *Id.* at 3 ¶ 10 (emphasis added).[12]

13       Dr. Sperry's opinion that the swelling would have been obvious to "anyone conducting a

14   proper welfare check" of Decedent in the hours prior to his passing is inadmissible because it is not

15   within Dr. Sperry's scope of expertise as a pathologist.  Even if the Court were to consider the

16   opinion admissible, it does not create a triable issue of fact as to whether McRoberts made an

17   intentional decision that put Decedent at a substantial risk of suffering serious harm, or that a

18   reasonable officer under similar circumstances would have perceived the high degree of risk

19   involved.

20       "A trial court can only consider admissible evidence in ruling on a motion for summary

21   judgment."  *Orr*, 285 F.3d at 773.  To be admissible under Federal Rule of Evidence 702, an expert

22   witness must be qualified and the testimony must be reliable and relevant.  *Daubert v. Merrell Dow*

23   *Pharm., Inc.*, 509 U.S. 579, 589-91 (1993); Fed. R. Evid. 702.  The trial court serves a special

24   "gatekeeping" function with respect to Rule 702.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137,

25   _____

26   [12] This opinion appears only in the declaration of Dr. Sperry in opposition to Defendants' motion; it
     is not contained in his expert report (Doc. 200-11 at 4-15) and, in fact, appears inconsistent with or contrary
     to opinions in Dr. Sperry's rebuttal report.  Specifically, in responding to Defendants' expert witness
27   (physician Theodore Chan), Dr. Sperry opines that the "inadequate 'checks' were performed through a small
     locked cell" and if Decedent "had ever actually been physically examined by a correctional officer or a
28   medical professional, who would have touched him, taken his vital sign parameters, and or conducted a true
     physical examination, it would have been obvious that he was quite ill …"  (Doc. 200-11 at 19).

1   147 (1999).  In the proper execution of this gatekeeping role, "a district court may properly exclude

2   unreliable, and therefore inadmissible, expert testimony when deciding a motion for summary

3   judgment."  *Doucette v. Jacobs*, 106 F.4th 156, 169 (1st Cir. 2024) (citation and footnote omitted).

4   Accord *Pyramid Tech., Inc. v. Hartford Cas. Ins. Co*., 752 F.3d 807, 817 (9th Cir. 2014) (upholding

5   district court's exclusion of expert opinion on summary judgment because expert did not have the

6   knowledge or experience required under Rule 702 to permit him to give the opinion proffered);

7   *Kirstein v. Parks Corp*., 159 F.3d 1065, 1067-68 (7th Cir. 1998) (affirming district court's rejection

8   of expert opinion offered by plaintiff's safety engineer in opposition to summary judgment motion

9   as "unscientific speculation offered by a genuine scientist" because expert was not a chemist and

10  the opinion rendered required expertise in chemistry).

11          Further, in resolving a summary judgment motion, the district court is "well within its

12  discretionary gatekeeper role" under *Daubert* to *sua sponte* disregard an unqualified expert

13  witness's opinion, even without the benefit of the opposing party's briefing.  *Doucette*, 106 F.4th

14  at 170-71.  Accord *O'Conner v. Commonwealth Edison Co*., 13 F.3d 1090, 1094, 1107 & n.19 (7th

15  Cir. 1994) (affirming district court's *sua sponte* rejection of expert testimony offered in opposition

16  to summary judgment; finding expert not sufficiently qualified to offer opinion rendered).

17          Nothing in the record suggests that Dr. Sperry has qualified expertise as a correctional

18  official or on prison or facility procedures.  Dr. Sperry's declaration and attached expert materials

19  reflect that he is an expert in pathology but do not evidence that he holds expertise in the fields of

20  detainment facilities or their procedures, and he does not define "proper welfare check" for

21  purposes of putting in context his opinion that Decedent suffered from a hand injury that would

22  have been observable during such a check.  *See* (Doc. 200-11).  It is Plaintiffs' burden as the

23  proponent of Dr. Sperry's testimony to prove the admissibility of his opinions at least by a

24  preponderance of the evidence.  *Engilis v. Monsanto Co*.,151 F.4th 1040, 1049-50 (9th Cir. 2025);

25  *Lust v. Merrell Dow Pharms., Inc*., 89 F.3d 594, 598 (9th Cir. 1996).  Here, given that Dr. Sperry's

26  expertise is in the field of pathology, the Court finds Plaintiffs cannot carry their burden under Rule

27  702 to establish his expertise to opine about a "proper welfare check" and that such an opinion is

28  inadmissible as "unscientific speculation offered by a genuine scientist."  *Kirstein*, 159 F.3d at

1  1067-68.

2  Dr. Sperry's opinion about what constitutes a "proper welfare check" in the setting of a

3  custodial facility and, specifically, what could or should have been observable during such a check

4  at the facility housing Decedent, thus, is no more than a drawing of an inference from the facts of

5  the case and without relating the inference drawn to any specialized knowledge in his field of

6  expertise.  *See Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), *as amended* (Apr. 27, 2010)

7  ("Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the

8  pertinent inquiry.  And it is reliable if the knowledge underlying it has a reliable basis in the

9  knowledge and experience of the relevant discipline."); *Calloway v. Contra Costa Cnty. Jail Corr.*

10  *Officers*, No. C 01-2689 SBA, 2007 WL 134581, at *26 (N.D. Cal. Jan. 16, 2007), *aff'd*, 243 F.

11  App'x 320 (9th Cir. 2007) ("Defendants object to a portion of … the Greifinger Declaration, in

12  which he states 'County Jail leadership, medical staff, and custody staff purposefully failed to act

13  to respond to Mr. Calloway's medical need.' … [Dr. Greifinger] is without personal knowledge

14  and rendering an opinion which is outside the scope of his expertise."); *Diaz v. Cnty. of Ventura*,

15  No. CV 19-4695-DMG (AGRx), 2021 WL 6752003, at *2 (C.D. Cal. Nov. 22, 2021) ("Assuming

16  that Roder is a qualified expert in scene reconstruction, he offers opinions that go far beyond this

17  expertise.  He opines that Defendant's gunshots amounted to a 'sympathetic reflex response,'

18  without even explaining what that term means, much less how he reached the conclusion or how

19  he is qualified to offer it.").

20  Even were the Court to credit Dr. Sperry's opinion, because he does not define "proper

21  welfare check" for purposes of putting in context his opinion that Decedent suffered from a hand

22  injury that would have been observable during such a check, the opinion does not create a triable

23  issue of fact as to whether McRoberts made an intentional decision that put Decedent at a

24  substantial risk of suffering serious harm, or that a reasonable officer under similar circumstances

25  would have perceived the high degree of risk involved.  *See* (Doc. 178-4 ¶¶ 6, 9, 19, 21); *Cole*, 548

26  F. Supp. 3d at 994-95 (finding the plaintiff's expert opinions that defendant "failed to realize the

27  significance of certain symptoms, and failed to consider potentially more severe diagnoses" and

28  "could have done [more] to diagnose [the decedent] had he recognized the importance [of] the

1  symptoms" did not create triable issues of fact precluding summary judgment on plaintiff's

2  Fourteenth Amendment claim).

3      Plaintiffs also offer the declaration of Will Adams, a retired California Department of

4  Corrections and Rehabilitation ("CDCR") officer. (Doc. 200-10). Mr. Adams opines that

5  "sufficient time to conduct [a safety check] should usually be no less than [five] seconds … A cell

6  check of less than [five] seconds is usually insufficient to determine if the inmate" requires medical

7  treatment. *Id.* ¶¶ 7-8. Even crediting Mr. Adam's report, it is not determinable from the record

8  that Decedent's hand was visible, or that any such potential lack of visibility of Decedent's hand

9  should have indicated to Defendant McRoberts to conduct a physical exam or refer Decedent to

10  medical staff. And in the event Decedent's hand was visible, nothing in the record suggests it

11  would be sufficient to make Defendant McRoberts aware, from the viewpoint of a cell door and the

12  distance therein, of injury or infection.

13      McRoberts indisputably was late by several minutes in conducting some of his required

14  safety checks of Decedent's cell and missed one cell check altogether in the hours leading to

15  Decedent's passing. However, the record evidence, even in the light most favorable to Plaintiffs,

16  does not permit a finding that Decedent's presentation during McRoberts' cell checks "indicate[d]

17  the need for medical treatment" such that the cell checks were constitutionally defective. *See*

18  *Gordon II*, 6 F.4th at 973 ("pre-trial detainees do have a right to direct-view safety checks sufficient

19  to determine whether their presentation indicates the need for medical treatment."). The facts

20  permit at most a finding that Defendant McRoberts' conduct was negligent, which is insufficient

21  to establish a violation of the Fourteenth Amendment. *Sandoval*, 985 F.3d at 669.

22          b.  Defendant De La Torre

23      In comparison to Defendant McRoberts, the record before the Court presents even less as

24  to any deliberate indifference exhibited by Defendant De La Torre.[13] It is undisputed Defendant

25  De La Torre was on duty on January 13, 2022, and conducted "four security checks during his

---

27  [13] Plaintiffs do not address Defendant De La Torre's conduct in connection with Decedent's cell
28  checks and only raise his conduct regarding the transport incident. (Doc. 205 at 10). Nonetheless, as
    Plaintiffs assert, albeit in conclusory fashion, that Defendant De La Torre's safety checks were deficient
    (Doc. 198 ¶ 96A), the Court analyzes Defendant De La Torre's conduct regarding cell checks.

35

shift," between approximately 7 p.m. and 11 p.m., "two on the top tier and two on the bottom." (Doc. 198 ¶¶ 92-93). "During his second security check after meds pass, he walked by [Decedent's] cell and noticed him lying on the floor towards the back of the cell with both legs on the floor." *Id.* ¶ 94. During his last check, "he noticed [Decedent] still laying towards the back of the cell but he had put one of his legs to rest on the top of the bottom bunk bed and was in a different position than the last time he was checked on." *Id.* ¶ 95. Although Plaintiffs argue that Defendant De La Torre's checks were deficient and that he was aware of Decedent's purported inability to walk based on his observation of Decedent during the transport incident (*id.* ¶ 96A), this is insufficient to create a triable issue of fact for the same reasons as noted above concerning Defendant McRoberts. Namely, even if Defendant De La Torre's safety checks were not strictly in compliance with governing policy, the evidence does not permit a finding that either he was, or an objectively reasonable would be, aware that Decedent presented any heightened risk of injury. As noted *supra*, the transport incident did not reasonably put De La Torre (or any other Defendant) on notice that Decedent displayed any indicators of a serious medical condition warranting medical attention.

In summary, neither Plaintiffs' statement of facts nor the arguments they raise in their opposition brief present a sufficient basis for finding that disputed issues of material fact exist concerning the alleged deficiency of Defendants' cell checks of Decedent, or that an objectively reasonable correctional officer would be aware under the same circumstances that Decedent faced a heightened risk of serious injury, or that Defendants recklessly disregarded any such risk. Drawing all inferences in favor of Plaintiffs, the record before the Court is not one from which a reasonable jury could find Defendants De La Torre and McRoberts deliberately indifferent. *Cf. Medina v. Cnty. of Los Angeles*, No. CV 19-3808-GW-EX, 2020 WL 3964793, at *7 (C.D. Cal. Mar. 9, 2020) (finding triable issue of fact where deputies falsified logs and knowingly skipped three safety checks in a row, and facts in record supported a layperson could have observed a serious medical need, particularly as decedent had a cellmate who was aware that decedent was making a funny sound and appeared to be choking, and the cellmate ultimately flagged the deputy when they conducted the next safety check); *see Cole*, 548 F. Supp. 3d at 994-95 ("However, [defendant] cannot be held responsible for failing to draw appropriate conclusions from facts of which he was

1    not aware … Dr. Gulick's report does call into question [defendant's] medical judgment and

2    strongly suggests he was negligent … But this is a claim of deliberate indifference under the 14th

3    Amendment, and the record cannot support a finding that McAllister recklessly disregarded Eads'

4    medical condition."); *see also Yang v. Cnty. of Yuba*, No. 2:23-CV-00066-TLN-JDP, 2024 WL

5    3010876, at *5 (E.D. Cal. June 13, 2024) (explaining, at the motion to dismiss stage, that "Plaintiffs

6    do not allege Ramos knew Yang had previously been on suicide watch … Applying this objective

7    standard to Ramos, a reasonable prison officer, who is not aware that a detainee in general

8    population was at a heightened suicide risk, would not necessarily appreciate any high degree of

9    risk from not conducting a more thorough safety check beyond glancing into the detainee's cell.").

10        **E.        Deprivation of Familial Relationship**

11        The Fourteenth Amendment protects liberty interests in the companionship between parents

12   and children.  "Parents and children may assert Fourteenth Amendment substantive due process

13   claims if they are deprived of their liberty interest in the companionship and society of their child

14   or parent through official conduct."  *Lemire*, 726 F.3d at 1075.  "Only official conduct that shocks

15   the conscience is cognizable as a due process violation … A prison official's deliberately indifferent

16   conduct will generally 'shock the conscience' so as long as the prison official had time to deliberate

17   before acting or failing to act in a deliberately indifferent manner."  *Id.* (citations and quotations

18   omitted).

19        In opposition to Defendants' motion, Plaintiffs assert only that "it is undisputed that the

20   [D]efendants had time to deliberate before acting or failing to act."  (Doc. 205 at 17).

21        Here, Plaintiffs' claims of deprivation of familial relationship fail for the same reasons as

22   noted above.  Namely, Plaintiffs have failed to present any triable issue of fact as to the purported

23   deliberate indifference of the individual Defendants during the extraction incident, transport

24   incident, and cell checks.  *See Schwarz v. Lassen Cnty. ex rel. Lassen Cnty. Jail*, 628 F. App'x 527,

25   528 (9th Cir. 2016) ("Recovery for a violation of the right to familial association is generally

26   contingent on the existence of an underlying constitutional violation.  Therefore, because there is

27   no evidence that either Undersheriff Mineau or Lassen County was deliberately indifferent to

28   Parker's  serious  medical  needs,  Schwarz's  claim  for  loss  of  familial  association—which  is

1    predicated on their purportedly unconstitutional care of Parker—likewise fails as a matter of law.")

2    (internal citation omitted).  Further, even if a genuine dispute of material fact remained permitting

3    a finding that Defendants' conduct constituted more than negligence and conceivably violated

4    Decedent's constitutional rights, a trier of fact could not reasonably find that such conduct "shocks

5    the conscience" as is necessary to sustain Plaintiffs' due process claim.  *Lemire*, 726 F.3d at 1075

6       Thus, the Court will grant Defendants' motion as to the claims of deprivation of familial

7    relationship.

8       **F.    *Monell* Claims**

9       Although § 1983 imposes liability only on "persons" who, under color of law, deprive others

10   of their constitutional rights, the Supreme Court has construed the term "persons" to include

11   municipalities (such as a county or county agency).  *See Monell*, 436 U.S. at 690-691.

12      Pursuant to *Monell*, a "local government may not be sued under § 1983 for an injury

13   inflicted solely by its employees or agents."  *Id*. at 694.  Instead, the local government "is subject

14   to suit under § 1983 only 'if it is alleged to have caused a constitutional tort through a policy

15   statement, ordinance, regulation or decision officially adopted and promulgated by that body's

16   officers.'"  *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096-97 (9th Cir. 2013) (quoting *City of

17   St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988)).  To establish a municipality's liability under

18   *Monell*, a plaintiff "must show that (1) she was deprived of a constitutional right; (2) the

19   [municipality] had a policy; (3) the policy amounted to a deliberate indifference to her

20   constitutional right; and (4) the policy was the moving force behind the constitutional violation."

21   *Harmon v. City of Pocatello*, 854 Fed. App'x 850, 854 (9th Cir. 2021) (quoting *Mabe v. San

22   Bernardino Cnty., Dep't of Pub. Soc. Servs*., 237 F.3d 1101, 1110-11 (9th Cir. 2001)).  "The

23   Supreme Court has made clear that policies can include written policies, unwritten customs and

24   practices, failure to train municipal employees on avoiding certain obvious constitutional

25   violations, and in rare instances, single constitutional violations are so inconsistent with

26   constitutional rights that even such a single instance indicates at least deliberate indifference of the

27   municipality."  *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021) (internal and

28   concluding citation omitted).

It follows that, to prevail on a § 1983 claim against a municipal agency as a whole, a plaintiff must establish that the agency's policy or custom caused the inmate's injuries. *See Hyun Ju Park v. City & Cnty. of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020). This could be demonstrated by an unconstitutional policy, or that the agency "through inaction, failed to implement adequate policies or procedures to safeguard" the constitutional rights of its charges. *Id.* To hold an agency liable for a failure to act, plaintiff would need to demonstrate that it "exhibited deliberate indifference" to the violation of his rights. *Id.*; *see Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143–44 (9th Cir. 2012) (explaining that the plaintiff must prove that the municipal defendants acted with deliberate indifference, the same standard that a plaintiff has to establish in a § 1983 claim against an individual defendant). A municipality is deliberately indifferent to the violation of constitutional rights where it has a policy that is "obviously, facially deficient," or where there is a "pattern of prior, similar violations of federally protected rights, of which the relevant policymakers had actual or constructive notice." *Tsao*, 698 F.3d at 1142.

Single or sporadic instances of alleged unconstitutional actions do not evidence a policy, practice or custom under *Monell*. *See McDade v. West*, 223 F.3d 1135, 1141 (9th Cir. 2000) (plaintiff cannot demonstrate the existence of a policy based on a single occurrence of unconstitutional action committed by a non-policymaking employee); *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."); *Davis v. City of Ellensburg*, 869 F.2d 1230, 1233 (9th Cir. 1989) ("Davis has failed to establish that there is a genuine issue of material fact regarding the existence of a policy of inadequate training, inadequate medical treatment of prisoners, or deliberate indifference to the use of excessive force. A plaintiff cannot prove the existence of a municipal policy or custom based solely on the occurrence of a single incident of unconstitutional action by a non-policymaking employee.").

### i. *Inclusion of Both County of Kern and KCSO*

As a preliminary matter, the Court addresses Defendants' contention that Plaintiffs "create confusion by suing both KCSO and the County of Kern" and that one or the other party should be

1    dismissed.  (Doc. 178 at 16).

2          The Ninth Circuit recently reaffirmed its prior holdings that both a California municipal

3    police department and a California county sheriff's department were "public entities" that may be

4    sued.  *See Duarte v. City of Stockton*, 60 F.4th 566, 573 (9th Cir. 2023) ("As to the Stockton Police

5    Department, we held over thirty years ago that municipal police departments in California 'can be

6    sued in federal court for alleged civil rights violations.'  More recently, we reaffirmed this holding

7    and extended it to California's county sheriffs' departments.") (citing *Karim-Panahi v. L.A. Police*

8    *Dep't*, 839 F.2d 621, 624 n.2 (9th Cir. 1988) & *Streit v. Cnty. of Los Angeles*, 236 F.3d 552, 565–

9    66 (9th Cir. 2001)); *see also Hulet v. Cnty. of Tuolumne*, No. 1:23-CV-01217-KES-HBK, 2024 WL

10    3758360, at *5 (E.D. Cal. Aug. 12, 2024) (analyzing *Duarte* and finding the same).

11          Regarding the redundancy of naming both KCSO and the County of Kern, another judge of

12    this Court recently analyzed a similar contention.  In *Chapple v. County of Sacramento*,[14] the

13    defendant County of Sacramento and the Sacramento County Sheriff's Department argued that

14    claims against the department failed because it is not a distinct legal entity from the county and, as

15    the department is a unit of the county, it is redundant.  In support of their argument, the *Chapple*

16    defendants relied upon *Pierce v. San Mateo County Sheriff's Dep't*, 232 Cal. App. 4th 995, 1000

17    n.1 (2014).

18          The court, ruling on motions to dismiss, found that the "'rationale' the County and

19    Department rely upon in *Pierce* is a one sentence footnote" and that there "is no analysis in this

20    footnote to support the redundant defendant theory that the Department and the County propose

21    here." *Chapple*, 2025 WL 1678402, at *10 (citing *Hulet*, 2024 WL 3758360, at *5; *Est. of Debbs*

22    *v. Cnty. of Sacramento*, No. 2:20-CV-01153-TLN-DB, 2023 WL 4108320, at *4 (E.D. Cal. June

23    21, 2023); & *Harris by & through Lester v. Cnty. of Sacramento*, No. 2:17-CV-02346-MCE-AC,

24    2018 WL 3752176, at *3 (E.D. Cal. Aug. 8, 2018)).   The Court observed it was "unclear whether

25    this statement was meant to refer only to the San Mateo County Sheriff's Department or to all

26    sheriff's departments generally" and that courts "have found § 1983 actions can proceed

27    simultaneously against a County and a Sheriff's Department.  The Department and County's

28

---

[14] No. 2:24-CV-01939-TLN-CSK, 2025 WL 1678402 (E.D. Cal. June 13, 2025).

1    arguments to the contrary are unpersuasive at this stage." *Id.*

2        In support of their redundancy argument, Defendants cite to *Darby v. Pasadena Police*

3    *Dep't*, 939 F.2d 311 (5th Cir. 1991). However, *Darby* is an out-of-circuit case interpreting Texas

4    law and, as such, has no relevance here. Defendants also cite to *Morris v. State Bar of Cal.*, No.

5    CV F 09-0026 LJO GSA, 2010 WL 4977677 (E.D. Cal. Dec. 2, 2010); *Hervey v. Estes*, 65 F.3d

6    784, 792 (9th Cir. 1995); and *Sanders v. Aranas*, No. 1:06-CV-1574 AWI SMS, 2008 U.S. Dist.

7    LEXIS 6402, at *1 (E.D. Cal. Jan. 28, 2008).

8        First, all three cases predate the Ninth Circuit's decision in *Duarte*. Second, *Morris* cites

9    to *Hervey* and *Sanders* in support of the conclusion that the Fresno County District Attorney's

10   Office is a "sub-unit" of the County of Fresno. *Morris*, 2010 WL 4977677, at *2. However, in

11   addition to predating *Duarte*, *Hervey* concerns an intergovernmental association in Washington

12   state, not a municipality or local government entity, and the court cautioned that, despite being an

13   "informal association of various governmental entities," the component members may be sued and

14   subject to joint and several liability for constitutional violations. *Hervey*, 65 F.3d at 792.

15       *Sanders* not only predates *Duarte* but its conclusion that the "Fresno Police Department is

16   not a proper defendant because it is a sub-division of the City of Fresno" is preceded by discussion

17   that municipal departments and sub-units are generally not considered "persons" for purposes of

18   section 1983. *Sanders*, 2008 WL 268972, at *3 (citing *United States v. Kama*, 394 F.3d 1236, 1239

19   (9th Cir. 2005) (Ferguson, J., concurring)). The Ninth Circuit in *Duarte* expressly discounted said

20   reading of the decision in *Kama*, referring to the same quote from the concurrence cited in *Sanders*,

21   and explained that "concurring opinions have no binding precedential value" and that the

22   concurrence did not cite *Karim-Panahi* or *Streit*. *Duarte*, 60 F.4th at 574 (citations and quotations

23   omitted) (reversing district judge's determination that the City of Stockton and Stockton Police

24   Department are not persons within the meaning of § 1983.).

25       Thus, the Court finds unpersuasive Defendants' arguments that the inclusion of the County

26   of Kern as a defendant renders KCSO redundant, or vice versa, in this action, such that neither

27   Defendant is subject to dismissal on this ground alone.

28   ///

41

*ii.*    ***Deficient Cell Checks***

a.    Plaintiffs' Contentions

Plaintiffs assert that all of the cell checks of Decedent's cell were deficient and, thus, the County of Kern had a policy or custom of conducting deficient cell checks.  In support of this contention, Plaintiffs cite to *Nyarecha v. Cnty. of Los Angeles*, No. 23-55773, 2024 WL 4511616 (9th Cir. Oct. 17, 2024).  Plaintiffs argue that, as in *Nyarecha*, the collective inaction of numerous officials resulted in Decedent's death.  (Doc. 205 at 21-22).

In *Nyarecha*, the decedent was a pre-trial detainee housed in moderate observation housing ("MOH") because of a medical diagnosis.  The decedent was found dead in his cell by an inmate.  The facility's policy required MOH cells to be subject to safety checks every 30 minutes.  In the 13 hours prior to being found, at least six different officers did not assess the decedent's condition.

The Ninth Circuit found a triable issue of fact as to *Monell* liability.  The Ninth Circuit noted that:

> [26] different safety checks each of a seven-cell area, performed by at least six officers, working two different shifts, were *all* constitutionally deficient.  During those checks, none of the officers stopped outside of [decedent's] cell or the cells of the other detained inmates.  Instead, the officers consistently completed their checks of [decedent's] seven-cell area in under twenty seconds, without breaking stride or pausing to look into the cells.  And at no point did any officer attempt to elicit a response from [decedent] or any other inmate.  Moreover, the officers each completed their checks independently, and completed them in the exact same deficient manner, indicating that the behavior exhibited during the [26] checks is indeed the norm.  It is highly unlikely such consistency would have been seen if this were not the de facto policy.

*Nyarecha*, 2024 WL 4511616, at *2 (emphasis in original).

The *Nyarecha* court distinguished *Gordon II* by noting that, there, two deficient safety checks were carried out by the same officer.  *Id.*  In *Gordon II*, the deputy was aware that Gordon required medical attention, and "conducted his safety check of Gordon from a corridor that was approximately six feet elevated from the tank floor and 12 to 15 feet away from the foot of Gordon's bunk."  The deputy "admitted that, from his vantage point, he was unable to ascertain whether Gordon was breathing, alive, sweating profusely, drooling, or had any potential indicators of a

1    physical problem." *Gordon II*, 6 F.4th at 967.

2        Plaintiff's counsel, in his declaration accompanying the opposition to Defendants' motion

3    for summary judgment, attests that "67% of the cell checks of [c]ell C-216 were completely

4    deficient" and "83% of the cell checks during this period of time, from 7:00 p.m. on January 11,

5    2022, through 4:30 a.m. on January 14, 2022, were either deficient or late.  Additionally, almost all

6    of the top tier cell checks during this period were completely deficient." (Doc. 200 ¶ 4).  In neither

7    the opposition nor accompanying declarations do Plaintiffs describe in any significant detail why

8    said checks were deficient.  *See* (Docs. 198, 200, 201, 202, 203, 205, 225).  Plaintiffs, in their

9    statement of uncontroverted facts, assert 61 such occurrences of deficient cell checks.  For the

10   majority of the listed checks, Plaintiffs do not articulate reasoning as to why the checks were

11   deficient, though sometimes provide short statements (*e.g.*, "Carmona just walks by all cells,"

12   "walk-by," "turn-around").  *See* (Doc. 214 at 7-14).

13                                b.  Record Evidence

14       The Court has reviewed the cell checks identified by Plaintiffs as well as the video

15   surveillance footage provided by Plaintiffs and cited to in support of their characterization of the

16   cell checks (Doc. 202, Exs. 43-47).  KCSO Policy C-450 governs safety checks.  (Doc. 201-1).  As

17   noted *supra*, C-450 requires a "direct visual safety check of inmates housed in pods, dorms or

18   barracks" once every 60 minutes.  *Id.* at 1.  A safety check is defined as "[e]ntry into a housing unit

19   by a deputy during which the deputy makes a direct visual observation of the housing unit and all

20   inmates within the housing unit."  The policy states that the intent of such a check is to "[a]ccount

21   for the presence of the inmate(s), identify if anything appears out of order and look for signs of

22   observable distress or trauma."  *Id.*

23       In the Ninth Circuit, "pre-trial detainees have a right to direct-view safety checks sufficient

24   to determine whether their presentation indicates the need for medical treatment."  *Gordon II*, 6

25   F.4th at 973.  However, in *Gordon II*, "the Ninth Circuit did not reach whether the safety checks

26   were adequate, because the right it found had not previously been clearly established."  *Laurel v.*

27   *Cnty. of Alameda*, No. 24-CV-04427-RFL, 2025 WL 2402674, at *5 (N.D. Cal. Aug. 19, 2025)

28   (noting a failure to provide "timely and sufficient direct-view safety checks").  Thus, the clearly

established law does not mandate intervals for such checks, though the applicable KCSO policy requires a safety check every 60 minutes.  Neither the clearly established law nor the applicable KCSO policy mandate a duration or spatial distance for such checks, other than they must be "direct-view," sufficient to determine whether the presentation of the detainee indicated a need for medical treatment, and allow identification of anything out of order or for signs of observable distress or trauma.

The safety checks identified in Plaintiffs' statement of facts (Doc. 214 at 7-14) range from the evening of January 11, 2022, beginning at approximately 7:00 p.m., and end at approximately 4:21 a.m. on January 14, 2022, the final check before Decedent was found unresponsive at approximately 5:25 a.m. that day.  The Court has reviewed all said safety checks cited by Plaintiffs and the referenced video footage, including the final 5:25 a.m. safety check.  *See* (Doc. 202, Exs. 43-47).

Counting corresponding checks of the lower tier and top tier of the unit as part of the same single check (even where they may be separated by some amount of time), the Court finds approximately 63 total safety checks, including the final 5:25 a.m. check and a safety check not cited by Plaintiffs, conducted at approximately 4:41:59 p.m. on January 13, 2022.  The Court notes this safety check because Plaintiffs assert that the subsequent 5:37:54 p.m. check was late but, as a safety check not referenced by Plaintiffs was conducted at 4:41:59 p.m., the 5:37:54 p.m. check is not late as it was conducted within the 60-minute threshold.  *See* (Doc. 214 ¶ 574).

The cell checks here evidence some important distinctions from *Nyarecha*.  The *Nyarecha* court found "that the jury could find deliberate indifference where six different guards passed a dying inmate 26 times without performing an adequate safety check."  *See Est. of Hill by & through Grube v. NaphCare, Inc.*, No. 23-2741, 2025 WL 1588738, at *3 n.4 (9th Cir. June 5, 2025) (citing *Nyarecha*, 2024 WL 4511616).  The *Nyarecha* court also noted the following factors in concluding the district court improperly granted summary judgment to the defendants: none of six different officers, working two different shifts, stopped outside the decedent's cell or the cell of any other inmate; none of the officers broke stride or paused to look into the cells; at no point did any officer attempt to elicit a response from the decedent or any other inmate; each officer completed their

checks independently yet in the "exact same deficient manner, indicating that the behavior exhibited during the [26] checks is indeed the norm. It is highly unlikely such consistency would have been seen if this were not the de facto policy." Lastly, the *Nyarecha* court noted that the safety check sergeant charged with supervising officers who conducted such checks asserted, after reviewing video footage of the aforementioned checks, that he believed the checks were compliant with the sheriff's department's policies, which further supported "the inference that safety checks in which officers do not appear to stop at an inmate's door for more than a few seconds and do not appear to look through the door to discern the inmate's condition are consistent with [department] policy." *Nyarecha*, 2024 WL 4511616, at *2.

Here, it is undisputed that Defendant McRoberts missed one safety check of Decedent and the record shows he was late by up to a few minutes on four others in the hours leading up to Decedent's death. (Doc. 198 ¶ 83; Doc. 200, Ex. 29). The Court identifies a total of three missed safety checks by Defendant McRoberts: on January 12, 2022, at 8:31:05 p.m., McRoberts does not reach Decedent's cell, as well as two other cells; on January 13, 2022, at 2:26:05 p.m., McRoberts does not reach Decedent's cell, as well as three other cells; and the 2:28:19 a.m. check on January 14, 2022, where McRoberts did not reach Decedent's cell. These are the only missed checks the Court can confirm from the video exhibits of record, on Decedent's cell or any other detainee's cells, from the evening of January 11, 2022, until the early morning of January 14, 2022.[15]

A review of each safety check of Decedent's cell and other cells on the lower tier, where Decedent's cell was located, evidences no obvious deficiency; officials consistently appeared to walk up to Decedent's cell as well as the cells of the other detainees, stop, and peer in through the observation window. At times, officials would converse with, or call out to, the detainee in question, including Decedent. The safety checks of cells on the top tier were less consistent, with different officials behaving differently. Defendant McRoberts consistently walked past the cells

---

[15] Plaintiffs assert that there was a missed cell check on January 11, 2022, as there "was no cell check of C-216 before 8:00 p.m." (Doc. 214 ¶ 525). The Court has identified a check of the lower tier cells, including Decedent's cell, at 6:35:06 p.m. that day as the closest in time preceding the next check at 8:08:38 p.m. See (Doc. 202, Ex. 40). It is unclear whether a check was missed or the 8:08:38 p.m. check was late. Regardless, the Court will view the evidence in the light most favorable to Plaintiffs. *Orr*, 285 F.3d at 772.

on the top tier, turning his head to look inside, but not breaking stride or slowing his gait.  Other deputies would walk slowly and slow their stride at observation windows but not stop completely, except at certain cells depending on the conditions presented, such as if it was dark within the cell. Yet other deputies would stop and observe at each cell.

Plaintiffs fail to develop with any specificity their summary argument that the cell checks were deficient, stating only that "the majority, if not all of the cell checks of [Decedent's] cell, as shown on video, were deficient" and that they were "obviously deficient because [Decedent] did not eat for at least 24 hours" and KCSO Policy H-600 required referral to medical staff.  (Doc. 205 at 21).

c.  Analysis – Cell Checks

As noted prior, Plaintiffs' statement of facts presents only summary comments regarding cell check deficiencies, where it does at all.  *See* (Doc. 214 at 7-14).  The Court will presume that Plaintiffs consider certain cell checks deficient because they do not conform to the standard set forth by Plaintiffs' expert Mr. Adams in his declaration accompanying the opposition, namely a guideline of five seconds or more of observation for a check to be sufficient.  (Doc. 200-10 ¶ 8). The Court observes there is no minimum duration set forth regarding direct-view cell checks, either in clearly established law or in KCSO Policy C-450.  Rather, the governing legal standard requires that checks be "sufficient to determine whether the presentation of the detainee indicated a need for medical treatment."  This standard embraces that checks may vary based on the circumstances present while the official is conducting the check.  It follows that a check that is sufficient to determine whether there is a need for medical treatment may vary substantially in the amount of time required, considering factors such as whether the cell is lit or dark, the degree of visibility as to the inmate's body, the inmate's history, and the conditions of the cell.

The Court notes that, from the evening of January 11, 2022, to the early morning of January 14, 2022, there were approximately 15 late safety checks on the lower tier where Decedent was housed, with six of these late checks attributable to Defendant McRoberts and possibly two to Deputy Navarro, possibly one to Deputy Velasquez, and six to unidentified officials.  During this time period, there were also approximately 13 late safety checks on the top tier.  The lateness ranged

from approximately seven seconds to approximately 14 minutes, with most being between 30 seconds and two-and-a-half minutes late.

The *Nyarecha* court focused its analysis of the cell checks' adequacy on the consistency of six different officers conducting deficient cell checks in exactly the same manner, along with ratification by the supervising officer regarding those checks. The evidence before the Court establishes no such consistency here. Rather, it shows that one deputy, Defendant McRoberts, accounted for the vast majority of the missed checks and approximately half of the late checks. The Court sees no obvious deficiencies with the safety checks of Decedent's cell and on the lower tier of the unit. Further, the record does not show any official ratification of clearly deficient checks or Defendant McRoberts' missed checks. Rather, an internal investigation found Defendant McRoberts' checks leading up to the time of Decedent's death to be contrary to KCSO policy. (Doc. 224).

"A plaintiff's [*Monell*] claim cannot be based on 'isolated or sporadic incidents; [liability] must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy.'" *Nyarecha*, 2024 WL 4511616, at *1 (citing *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 884 (9th Cir. 2022)) (alteration in original). Plaintiffs offer no evidence in their opposition or statement of facts of other occurrences of comparable events resulting from KCSO policies. Thus, to prevail on this claim, the alleged, sporadic deficiencies implicated by the safety checks of Decedent alone must present the "rare instance" where evidence of a single unconstitutional incident is sufficient to establish municipal liability. *Benavidez*, 993 F.3d at 1153. The facts before the Court are not sufficient to establish such a policy of deliberate indifference.

### d.   Analysis – KCSO Policy H-600

Plaintiffs point to KCSO Policy H-600 as another basis for the deficiency of Decedent's cell checks. (Doc. 205 at 21). KCSO Policy H-600 provides that a hunger strike occurs when an inmate refrains "from eating for more than 24 hours." In that event, a staff member discovering a strike will interview the inmate, notify the shift supervisor, notify the medical staff, and generate a CJIS report, and within 24 hours of the notification, medical staff will perform an initial assessment

1    of the inmate and monitor the inmat's health.  The shift supervisor will the notify the facility

2    manager and interview the inmate, as well as confer with medical staff, and the housing officer

3    must supplement the CJIS report after each meal, indicating whether or not food is consumed.  The

4    facility manager will notify the detentions bureau deputy chief.  (Doc. 202-5 at 1-3).

5          Plaintiffs assert in their statement of facts that Decedent "had not eaten for more than 24

6    hours, but no jail deputy notified medical staff as required by [KCSO Policy] H-600."  (Doc. 214

7    ¶ 523).  Deputy Brock's report documents the following: "There were three unopened sack lunches,

8    and one opened sack lunch outside of the cell.  Inside the cell, I observed one unopened sack lunch

9    next to the door."  (Doc. 201-8 at 4).  Plaintiffs also cite to deposition testimony from Lieutenant

10   Jaime Hernandez and Lieutenant Harris discussing the hunger strike policy.  *See* (Doc. 201-2).

11          Aside from asserting a violation of policy, Plaintiffs do not develop any argument as to any

12   alleged deficiency of KCSO Policy H-600 itself.  Rather, Plaintiffs assert that failure to implement

13   the policy where Decedent did not eat for more than 24 hours is an additional reason why the de

14   facto policy of cell checks were deficient.  Plaintiffs, however, do not elaborate or provide any

15   further reasoning therefor.

16          As noted above, Plaintiffs identify no evidence in their opposition or statement of facts of

17   other incidents or comparable events linked to KCSO policies.  Insofar as Plaintiffs argue that the

18   cell checks were deficient, as a matter of custom or de facto policy, due to officials' failure to

19   undertake notifications that Decedent had not eaten within 24 hours, Plaintiffs do not offer

20   argument or articulate reasoning drawn from evidence that the practice was of "sufficient duration,

21   frequency and consistency that the conduct has become a traditional method of carrying out policy"

22   nor that this incident alone was "so inconsistent with constitutional rights that even such a single

23   instance indicates at least deliberate indifference of the municipality."  *Sabra*, 44 F.4th at 884; *see*

24   *Benavidez*, 993 F.3d at 1153.

25          The facts before the Court are not sufficient to establish a policy of deliberate indifference.

26   *Cf. Dunsmore v. San Diego Cnty. Sheriff's Dep't*, No. 20-CV-00406-AJB-DDL, 2025 WL

27   2315038, at *8 (S.D. Cal. Aug. 11, 2025) (finding undisputed "evidence of preventable in-custody

28   deaths … two in-custody deaths [were classified] as homicides due to medical neglect in the

autopsy reports … an incarcerated individual lost 60 pounds of body weight over three months and did not receive medical treatment, and in 2023, Defendants failed to refill a Type-1 diabetic individual's insulin pump, despite repeated requests for the medication … For each death, the [expert report] analyzes failures in the Jail's medical management that contributed to the death.").

### iii.    *KCSPP C-250 and Policy H-200*

#### a.    KCSPP C-250

Plaintiffs contend that the KCSO policy "dealing with mentally disordered inmates" was Kern County Sheriff's Department Policies and Procedures ("KCSPP") C-250 but that "the policy was not enforced" and "KCSO provided no training on conducting cell checks of mentally disordered inmates." (Doc. 205 at 22).

The KCSPP C-250 policy provides, in relevant part:

> Any Staff Member who becomes aware of an inmate who appears to be suffering from any type of mental disorder or developmental disability will segregate the inmate from the general inmate population. Staff will refer the inmate to Medical and Mental Health Staff for evaluation as soon as possible.  When segregating an inmate under the provisions of this section, Staff will advise the Shift Supervisor and generate a CJIS Incident describing the inmate's behavior that indicated the need for segregation.  The care of inmates with mental disorders or developmental disabilities will be the responsibility of the Mental Health Staff and the Medical Staff. Mental Health will coordinate with Classification to arrange appropriate housing for such inmates.

(Doc. 202-20 at 1).

Plaintiffs' claims implicating this policy include failure to train and implement.  But there is no evidence in the record that there exists a pattern of constitutional violations by untrained KCSO or County of Kern employees.  Thus, Plaintiffs' claims must be considered in light of whether this case presents the "rare instance" where evidence of a single unconstitutional incident can sufficiently establish municipal liability.  *Benavidez*, 993 F.3d at 1153.

"[A] municipal defendant can be held liable because of a failure to properly train its employees only if the failure reflects a 'conscious' choice by the government.  In other words, the government's omission must amount to a 'policy' of deliberate indifference to constitutional

rights." *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 793 (9th Cir. 2016) (citing, *inter alia*, *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). "A plaintiff can satisfy this requirement by showing that the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers can reasonably be said to have been deliberately indifferent to the need." *Id.* (quotations omitted; citing *City of Canton*, 489 U.S. at 390). When evaluating *Monell* liability, the Court must assess whether there is a "direct causal link" between the county's failure to train and the plaintiff's alleged constitutional deprivation. *Castro*, 833 F.3d at 1075 (citing *City of Canton*, 489 U.S. at 385). It is plaintiff's burden to establish "that the injury would have been avoided had proper policies been implemented." *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1190 (9th Cir. 2006) (quotations omitted; citing *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1196 (9th Cir. 2002), *overruled on other grounds by Castro*, 833 F.3d 1060).

In opposition to Plaintiffs' failure-to-train/implement claim, Defendants proffer the declaration of Defendant Balasis, a KCSO sergeant, who declares that if a "general population inmate, or an otherwise unsegregated inmate, appears to be suffering a mental disorder [or] developmental disability, staff will refer this person to both medical and mental health." (Doc. 178-5 ¶¶ 1, 12). The purpose of this is "to ensure the behavior is not fleeting from either withdrawal or intoxication," and if it is from withdrawal or intoxication, "medical will monitor them." *Id.* ¶ 12. Defendant Balasis attests that Decedent "was already placed in administrative segregation. Clearing him through medical was not necessary because [Decedent] was not suffering from withdrawal or intoxication." *Id.* ¶ 13. Defendant Balasis declares that the "variance" from KCSPP C-250 is "justified by the common sense recognition that [Decedent] was already in administrative segregation at the time of the [extraction incident]." *Id.* ¶ 14.

Plaintiffs dispute this portion of Defendant Balasis' declaration on the grounds that KCSPP C-250 "does not make being on administrative segregation a condition of being referred to medical staff." (Doc. 198 ¶ 149A). This objection is without merit. As quoted above, KCSPP C-250 expressly mentions and concerns segregation of an inmate, with referral to medical and mental health staff accompanying said segregation. Plaintiffs argue that KCSPP C-250 was not enforced

50

but provide no specific facts or evidence to support this claim and appear to concede that Decedent was administratively segregated. Further, drawing all inferences in favor of Plaintiffs and assuming Decedent's cause of death was related to sepsis, Plaintiffs advance no persuasive reasoning showing that proper implementation of KCSPP C-250 would have prevented the harm.

Further, Plaintiffs assert that KCSPP Policy C-250 was "not enforced," citing in support to Defendants' statement of undisputed facts. (Doc. 205 at 22). However, the cited portion does not stand for said proposition; rather, it provides "[t]he way this policy is implemented in practice differs slightly in the way it is written," citing to paragraph 11 of the declaration of Defendant Balasis; paragraph 12, cited above, explains the statement cited in paragraph 11 here. (Doc. 198 ¶ 147). Regarding Plaintiffs' assertion that KCSO provided no training on conducting cell checks of mentally disordered inmates, Plaintiffs neither develop this argument nor provide any citations to the record in support. (Doc. 205 at 22).

At bottom, Plaintiffs' claims regarding KCSPP C-250 may amount to assertions of negligence but do not satisfy a standard of deliberate indifference. *Cf. Evans v. Cnty. of Los Angeles*, No. CV 19-793-MWF (JEMX), 2021 WL 1557607, at *8 (C.D. Cal. Feb. 26, 2021) ("Had the County lacked any classification process by which to separate high security risk inmates from low security risk inmates, or any training on how to deescalate conflict between inmates, it might reasonably be said that the County exhibited deliberate indifference to inmate safety.").

b.  Policy H-200

Plaintiffs assert that no one notified medical or mental health staff that Decedent had refused the court-ordered mental health evaluation, as required by Policy H-200, and it was not entered in the logbook. (Doc. 198 ¶ 517, 518). Plaintiffs relatedly argue that Dr. Longwith "went to Lerdo to evaluate [Decedent] on January 10, 2022, but he was turned away. [Decedent] allegedly refused the visit. However, no one from Lerdo notified medical staff of this refusal." (Doc. 205 at 22; citations omitted).

Policy H-200 provides, in pertinent part, that "[a]ny adult inmate may refuse emergency and/or non-emergency medical, mental health, or dental care. Detentions Bureau medical staff will process and document any inmate's refusal of medical or dental care in accordance with

1  [procedure]."  (Doc. 202-3).  The policy defines this care as "[a]ny medical/dental/mental health

2  appointments, doctor and/or nurse's sick call, medication pass, or other medical examination or

3  treatment. This includes situations where the inmate initially requests these services and also

4  requests by staff for medical examination of an inmate." *Id.* at 1.

5        Plaintiffs do not develop this argument any further and it is unclear whether Plaintiffs intend

6  to relate this argument to those discussed above concerning KCSPP C-250, or otherwise.  Plaintiffs

7  do not direct the Court's attention to any other evidence in the record concerning this claim.

8  Plaintiffs again do not provide evidence that there exists a pattern of similar alleged constitutional

9  violations by untrained KCSO or County of Kern employees nor provide argument that this case

10  presents the "rare instance" where evidence of a single unconstitutional incident can sufficiently

11  establish municipal liability. *Benavidez*, 993 F.3d at 1153.  Insofar as Plaintiffs assert that failure

12  to notify medical staff regarding Decedent's refusal of Dr. Longwith's evaluation informs a claim

13  of failure to train, no triable issue exists thereto for the same reasons as discussed *supra* concerning

14  KCSPP C-250. *See Evans*, 2021 WL 1557607, at *8 (finding "negligence at best" where plaintiff

15  "made no persuasive argument" as to need for supervision of the inmate classification process or

16  additional training on verbal arguments, and failed to show any such inadequacies were so likely

17  to result in constitutional violations that the county "can reasonable be said to have been

18  deliberately indifferent"); *cf. Greer v. Cnty. of San Diego*, 726 F. Supp. 3d 1058, 1076–77 (S.D.

19  Cal. 2023) (finding triable issue on failure to train where intake nurse testified she did not know

20  she was supposed to call doctor immediately to obtain anti-seizure medication, received no training

21  on the policy, and deputy did not implement nurse's instructions to place plaintiff in lower bunk,

22  resulting in plaintiff not receiving his medication, suffering a seizure, and falling from the top

23  bunk).

24                           *iv.*    ***Policy Concerning Penal Code § 1368***

25        Plaintiffs assert that, despite state court criminal proceedings twice finding a doubt under

26  California Penal Code § 1368 that Decedent was able to meaningfully assist his counsel, no policy

27  addressed "inmates whose criminal proceedings were suspended under § 1368 and who may need

28  medical care."  Plaintiffs argue that a "lack of such a policy was so likely to result in the violation

1    of constitutional rights" that the County of Kern can be said to have been deliberately indifferent

2    to the need for the policy.  (Doc. 205 at 23).

3            Plaintiffs do not identify facts or evidence that KCSO and the County of Kern lacked

4    policies regarding inmates with mental disorders but, rather, that they should have implemented a

5    specific policy for inmates for whom a doubt has been declared in state court proceedings, as

6    pursuant to California Penal Code § 1368.

7            Under *Monell*, in order to demonstrate the "policy deficiencies were the moving force

8    behind the deprivation of [] constitutional rights," a plaintiff must prove that the injury would have

9    been avoided had the County adequately trained its staff, or instituted adequate general policies to

10   guide the "staff's exercise of its professionally informed discretion."  *Long*, 442 F.3d at 1190.

11   While the record supports a finding that Decedent's mental state was troubled, Plaintiffs do not set

12   forth any facts or evidence showing that, had KCSO and the County of Kern implemented a specific

13   policy in regards to when a detainee has had doubt declared in state court proceedings, the Decedent

14   would not have suffered the harm.  Plaintiffs assert Decedent died of sepsis but proffer no evidence

15   that a policy requiring medical attention for conditions not related to mental health when doubt has

16   been declared as to a detainee's competency to participate in court proceedings would have

17   prevented his death by sepsis.

18                                    *v.*        ***Ratification***

19           Plaintiffs assert that Defendant Levig was "a final policymaker for the purpose of

20   establishing jail policy."  (Doc. 205 at 23; Doc. 214 ¶ 519).

21           "A municipality may be held liable for a constitutional violation if a final policymaker

22   ratifies a subordinate's actions. To show ratification, a plaintiff must show that the 'authorized

23   policymakers approve a subordinate's decision and the basis for it' … The policymaker must have

24   knowledge of the constitutional violation and actually approve of it. A mere failure to overrule a

25   subordinate's actions, without more, is insufficient to support a § 1983 claim." *Lytle v. Carl*, 382

26   F.3d 978, 987 (9th Cir. 2004) (quoting *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999)).  The

27   Ninth Circuit has held that "[s]ingle acts may trigger municipal liability where 'fault and causation'

28   were   clearly   traceable   to   a   municipality's   legislative   body   or   some   other   authorized

53

1    decisionmaker[.]" *Benavidez*, 993 F.3d at 1154 (citation and quotation omitted).

2           Plaintiffs' assertions against Defendant Levig are not supported by argument or cited

3    evidence.  Plaintiffs state only that Defendant Levig "was a final policymaker for the purpose of

4    establishing jail policy," with citation to the deposition of Lieutenant Hernandez and Lieutenant

5    Harris.  (Doc. 205 at 23; citing Doc. 214 ¶ 519).[16]  Plaintiffs provide no further explanation,

6    reasoning, or citations to evidence to support how Defendant Levig ratified any particular actions.

7    *See Bethune v. City of Washougal*, 642 F. Supp. 3d 1246, 1253 (W.D. Wash. 2022) (finding that

8    "Plaintiff has asserted no material facts that establish that Chief Steinbronn affirmatively approved

9    Officer Reagan's arrest of Plaintiff and the basis for it.  At most, Plaintiff has offered evidence that

10   Officer Reagan was subject to an internal investigation by a patrol sergeant and that the

11   investigation found no evidence of wrongdoing.").

12          **G.     State Law Claims**

13          In light of the foregoing analysis warranting the grant of Defendants' motion and dismissal

14   of all section 1983 claims, the remaining claims in this action all are brought pursuant to state law.

15   The Court may decline supplemental jurisdiction over state law causes of action under 28 U.S.C. §

16   1367(c) if "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially

17   predominates over the claim or claims over which the district court has original jurisdiction, (3) the

18   district court dismissed all claims over which it has original jurisdiction, or (4) in exceptional

19   circumstances, there are other compelling reasons for declining jurisdiction."  28 U.S.C. § 1367(c).

20   "While discretion to decline to exercise supplemental jurisdiction over state law claims is triggered

21   by the presence of one of the conditions in § 1367(c), it is informed by the … values of economy,

22   convenience, fairness, and comity."  *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir.

23   1999).  The Ninth Circuit has "frequently recognized that when federal claims are dismissed before

24   trial, supplemental state claims should ordinarily also be dismissed."  *Avelar v. Youth And Fam.*

25   *Enrichment Servs.*, 364 F. App'x 358, 359 (9th Cir. 2010) (citing, *inter alia*, *Jones v. Cmty.*

26   *Redevelopment Agency of City of Los Angeles*, 733 F.2d 646, 651 (9th Cir. 1984)).

---

27   [16] Plaintiffs' statement of facts cites to the deposition of the County of Kern, under Fed. R. Civ. P.
28   30(b)(6), and points to Exhibit 10.  However, Exhibit 10 is not said deposition transcript.  The Court
     presumes Plaintiffs intended to cite to Exhibit 15 (Doc. 201-2).

Here, the Court has resolved all of the federal claims over which it has original jurisdiction. "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). While the Court recognizes that litigation of a new suit places a burden on Plaintiffs, Plaintiffs make no showing to warrant this Court retaining jurisdiction over state law claims. *See* (Doc. 205). The remaining claims rely only on state law and, thus, a state court is in a better position to address said issues. *See, e.g., Est. of F.R. v. Cnty. of Yuba*, No. 2:23-CV-00846 WBS CKD, 2025 WL 1549104, at *7 (E.D. Cal. May 30, 2025) (declining supplemental jurisdiction after granting summary judgment for all federal claims).

Accordingly, the Court will decline to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims and they will be dismissed without prejudice.

*        *        *        *        *

Plaintiffs filed a motion seeking sanctions pursuant to the Court's inherent authority and Fed. R. Civ. P. 37 in the form of a mandatory adverse inference jury instruction and attorney's fees and costs against Defendant County of Kern for its spoliation of evidence. (Doc. 180). The motion was fully briefed and the Court heard the parties' oral arguments. *See* (Docs. 189, 194, 209). In short, Plaintiffs assert that they requested from Defendant the sample of Decedent's vitreous humor collected during his autopsy, which they intended to test for the purpose of supporting their argument that Decedent died from sepsis. Although Defendant complied with Plaintiffs' request, the vitreous humor sample was "split" (meaning only a portion of the sample was produced while the remaining portion was retained by the coroner) such that the small portion provided to Plaintiffs was too small to test. Thus, Plaintiffs argue that Defendant destroyed evidence (by purportedly rendering the vitreous humor sample unavailable for testing).

Preliminarily, the Court finds Plaintiffs' motion to be without merit, largely for the reasons discussed during the oral argument and set forth in Defendants' opposition to the motion (Doc. 189). However, the Court need not resolve the merits of the motion in light of its order granting Defendants' motion for summary judgment and dismissing the action. First, the primary relief sought (an adverse jury instruction) is mooted by dismissal of the action. Second, for purposes of

Defendants' motion for summary judgment, the Court has accepted Plaintiffs' contention that Decedent died of sepsis; thus, any testing result of the vitreous humor confirming sepsis as a possible cause of death would have no bearing on the Court's construal of this fact in the light most favorable to Plaintiffs.  Third, monetary sanctions in the form of an award of attorney's fees and costs are unwarranted, for two reasons.  Fees are not appropriate under Rule 37(a)(5) because Plaintiffs' motion will be denied.  Nor are fees appropriate in the exercise of the Court's inherent power given that Plaintiffs fail to demonstrate that any destruction of evidence by Defendant was undertaken with a culpable state of mind.  *See In re Napster, Inc. Copyright Litigation*, 462 F. Supp. 2d 1060, 1066-67 (N.D. Cal. 2006) ("… a party's motive or degree of fault in destroying evidence is relevant to what sanction, if any, is imposed.").  Specifically, there is insufficient evidence to find that Defendant acted in bad faith, which is a prerequisite to awarding monetary sanctions. *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 961 (9th Cir. 2006).

**IV.    Conclusion**

For the reasons set forth above, IT IS HEREBY ORDERED that:

1.  Defendants' motion for summary judgment (Doc. 178) is GRANTED.

2.  Plaintiffs' motion for sanctions (Doc. 180) is DENIED.

3.  The Clerk of the Court is directed to enter judgment accordingly and to CLOSE this case.

IT IS SO ORDERED.

Dated:   **November 25, 2025**    _____

UNITED STATES MAGISTRATE JUDGE

56